PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES BROOKS; DONALD HAMLETTE,

    *Plaintiffs-Appellants,*

    and

SAMUEL ST. JOHN,

    *Plaintiff,*

    v.

HOWARD R. ARTHUR, SR., in his
individual capacity,

    *Defendant-Appellee,*

    and

RANDAL W. MITCHELL,

    *Defendant.*

No. 11-1899

Appeal from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, Senior District Judge.
(6:08-cv-00028-NKM)

Argued: May 18, 2012

Decided: July 9, 2012

Before WILKINSON, NIEMEYER, and KING,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Judge King joined.

## COUNSEL

**ARGUED:** Richard F. Hawkins, III, HAWKINS LAW FIRM, PC, Richmond, Virginia, for Appellants. Sydney Edmund Rab, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Kenneth T. Cuccinelli, II, Attorney General, Wesley G. Russell, Jr., Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Plaintiffs James Brooks and Donald Hamlette, corrections officers at the Correctional Unit in Rustburg, Virginia, sued under 42 U.S.C. § 1983, alleging that the defendants unlawfully fired them for exercising their First Amendment rights to free speech. The Supreme Court has been quite clear, however, that "'complaints about . . . the employee's own duties'" that are "filed with an employer using an internal grievance procedure . . . do[ ] not relate to a matter of public concern and accordingly 'may give rise to discipline without imposing any special burden of justification on the government employer.'" *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2501 (2011) (quoting *United States v. Treasury Emp.*, 513 U.S. 454, 466 (1995)). We therefore affirm the grant of summary judgment for the defendants.

I.

Plaintiffs James Brooks and Donald Hamlette were employees of the Virginia Department of Corrections ("VDOC") working at Rustburg Correctional Unit #9 in Rustburg, Virginia. Brooks was a senior corrections officer, super-

vised by Hamlette, a lieutenant. Hamlette is African-American and a Baptist minister. Both men reported to the defendants, Howard Arthur, the Superintendent, and Major Randal Mitchell, the Assistant Superintendent.

On April 7, 2006, Brooks met with Althea McKnight, a personnel assistant with the VDOC's Equal Employment Opportunity office, to discuss filing a discrimination charge against Arthur. No formal charge was made at that time, but on May 9, 2006, Brooks met with Larry Huffman, the VDOC's Regional Director and Arthur's direct superior, to elaborate on his complaints. Among other things, Brooks reported that Mitchell embarrassed him by reprimanding him in front of inmates in violation of Department policy. After this meeting, Arthur called Brooks into his office to discuss his complaints and Brooks's decision to take them to a higher level in the chain of command. Brooks claims that Arthur told him that "you won't hear anything" about the allegations Brooks had made to Huffman.

At the same time, Hamlette also began pursuing proceedings against Arthur and Mitchell. On April 21, 2006, he filed an EEO complaint alleging that the defendants discriminated against him on the basis of race and religion. He complained that, as the only African-American lieutenant in the unit, he was treated differently from the other officers. Hamlette alleged incidents including additional unwarranted security checks during his shift, an insinuation that Hamlette would not have reported a disciplinary violation involving an inmate with a cell phone, the more lenient disposition of disciplinary charges against an inmate who was disrespectful to Hamlette, and the selection of Hamlette for less-advantageous duty assignments in the prison kitchen. Hamlette named Brooks as a potential witness to these allegations.

On August 30, 2006, one day before witness responses were due to the EEO, Arthur issued termination notices to Hamlette and Brooks for disciplinary violations that Arthur

observed during a monthly security inspection of the unit. These notices alleged that Brooks and Hamlette failed to staff posts as required and falsified inmate count records. Brooks and Hamlette challenged their terminations with the VDOC Department of Employment Dispute Resolution, which reduced the severity of the charges, limited the complainants' punishment to ten-day suspensions, reinstated both men's employment, and awarded them back pay.

On September 2, 2008, Brooks and Hamlette filed complaints in federal district court under 42 U.S.C. § 1983. They first alleged that defendants retaliated against them for the exercise of their First Amendment rights in the course of lodging their employment complaint. The second count claimed defendants deprived plaintiffs of due process under the Fourteenth Amendment by interfering with the employment dispute process. A third count alleged a state law claim against Arthur for tortious interference with plaintiffs' employment contract with the VDOC.

The district court initially dismissed the complaint in its entirety as barred by res judicata, holding that the VDOC and the defendants were in privity during the employment dispute resolution proceedings. *See Brooks v. Arthur*, 611 F. Supp. 2d 592 (W.D. Va. 2009). This court reversed that determination and allowed the claims to proceed. *See Brooks v. Arthur*, 626 F.3d 194 (4th Cir. 2010). On remand, the district court concluded that "the 'threshold question' of showing that Plaintiffs' speech addressed a matter of public concern has not been satisfied," *Brooks v. Arthur*, 2011 WL 3102791, at *14 (W.D. Va. 2011) (internal citation omitted), and therefore granted summary judgment for the defendants on July 26, 2011.[1] This appeal followed.

---

[1]Plaintiffs did not oppose the entry of summary judgment for the defendants as to the due process claim, and so the only counts at issue before this court are the First Amendment claim and the state law tortious interference claim.

II.

We review the district court's grant of a motion to dismiss de novo. *See Lux v. Judd*, 651 F.3d 396, 401 (4th Cir. 2011). In so doing, however, we must respect the limits the Supreme Court has imposed on suits by public employees alleging retaliation for expression protected by the First Amendment.

A.

It is undisputed that public employees may not "constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). But this protection "does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick v. Myers*, 461 U.S. 138, 149 (1983). In *Connick*, the Supreme Court stressed that "the repeated emphasis in *Pickering*" on the need for an employee to be speaking as a citizen on matters of public concern "was not accidental," *id.* at 143, but rather sets the boundaries of what speech is protected in the public employment setting.

To implement *Connick*, this court in *Daniels v. Quinn*, 801 F.2d 687 (4th Cir. 1986), and *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998), adopted a three-part test to determine whether a public employee has stated a First Amendment claim for retaliatory discharge. First, we consider "whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." *Id.* at 277. Second, even if the employee spoke upon a matter of public concern, we must determine "whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest" in managing the working environment. *Id.* And finally, if the employee's claim satisfies both of these legal criteria, the court turns to the factual question of "whether the employee's speech was

a substantial factor in the employee's termination decision." *Id.* at 277-78.

The first prong of the *McVey* test, whether the speech addressed a matter of public concern, is "the threshold question." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987). If an employee's speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for [the employee's] discharge." *Connick*, 461 U.S. at 146. If the employee cannot carry this burden, then summary judgment for the employer is appropriate, even if the termination decision "may not be fair" or is "mistaken or unreasonable." *Id.* at 146-47.

The *Connick* Court did not draw sharp lines for when "an employee's speech addresses a matter of public concern," but instead directed courts to consider the "content, form, and context of a given statement." *Id.* at 147-48. This is not to say that *Connick* left the lower courts without guidance, however. As to content, the Court cautioned against presuming "that all matters which transpire within a government office are of public concern." *Id.* at 149. To determine the protected status of an employee's speech, *Connick* directed us to scrutinize the comments to assess whether they are intended "to evaluate the performance of the office"—which would merit constitutional protection—or merely "to gather ammunition for another round of controversy" with superiors—which would not. *Id.* at 148. The *Connick* Court was explicit on this point: "When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view" that the employee's speech addresses solely a private dispute. *Id.* at 153. At bottom *Connick* reflects the belief that many ordinary disputes in the public workplace should be settled or resolved without calling the heavy artillery of the Constitution into play.

More recently, the Supreme Court has expressed skepticism that speech in the context of an employment grievance pro-

ceeding addresses a public concern meriting constitutional protection under *Pickering*. In *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995), the Court held that "private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer." *Id.* at 466. Most recently, in *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488 (2011), the Court spoke very directly to the facts of this case, holding that a "petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Id.* at 2501. The mere fact that "the public may always be interested in how government officers are performing their duties . . . will not always suffice to show a matter of public concern." *Id.*

As the district court recognized, our court presaged these recent instructions from the Supreme Court in earlier cases applying *Connick* and *Pickering*. In *Stroman v. Colleton County School District*, 981 F.2d 152 (4th Cir. 1992), we stated that "[p]ersonal grievances [such as] complaints about conditions of employment . . . do not constitute speech about matters of public concern that are protected by the First Amendment." *Id.* at 156. Similarly, in *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337 (4th Cir. 2000), we held that "mere allegations of favoritism . . . and other complaints of interpersonal discord[ ] are not treated as matters of public policy." *Id.* at 352. Thus, although this court has declined to "articulate any sort of bright-line rule," *Campbell v. Galloway*, 483 F.3d 258, 269 (4th Cir. 2007), we have been wary of affording the broad cover of the First Amendment to comments limited to "grievances about conditions of employment that cannot be considered matters of public concern," *id.* at 267. It is against this backdrop that we must evaluate what if any protection should be afforded to the plaintiffs' speech in this case.

B.

Examining Hamlette's allegations, we conclude that his speech pertained to personal grievances and complaints about conditions of employment rather than broad matters of policy meriting the protection of the First Amendment. As *Connick* directs courts to look at the "content, form, and context" of employee statements, *Connick*, 461 U.S. at 147, we shall take them up in turn.

Turning first to the content, Hamlette's EEO complaint focuses on personal dissatisfactions that are not matters of public concern. Indeed, his complaint is replete with I's and me's. First, in alleging that Major Mitchell mistreated him during an investigation of an inmate's possession of a cell phone, Hamlette stated that Mitchell "really hurt me because he was insinuating that if an inmate had told me where the cell phone was that I would not have told them." Second, in objecting to the dismissal of a complaint he had filed against an inmate, Hamlette complained that "they did not want to set too high a standard for the inmates, but the inmate disrespected me whether Major Mitchell thought so or not." Lastly, Hamlette questioned "why the food service supervisor can be disrespected enough to have an inmate locked up but when I am disrespected the inmate walks or the charge is thrown out."

None of these allegations addresses any public matter. While Hamlette undoubtedly—and perhaps justifiably—felt slighted by some of the alleged conduct, a purely personal grievance is not a matter of public concern. At the very end of Hamlette's allegations in his internal EEO complaint, he asks rhetorically whether the affronts of which he complained resulted "because I am a minister or because I am the only black lieutenant." As we shall explain, discriminatory institutional policies or practices can undoubtedly be a matter of public concern. *See infra* Part II.C. The gravamen of this matter, however, remains a series of personal differences between

Hamlette and Mitchell over such things as Mitchell's handling of Hamlette's complaint against an inmate or the treatment of an inmate who cursed at a kitchen supervisor. What seems clear is that Hamlette and Mitchell did not get along. Were we to constitutionalize poor personal chemistry in the workplace, however, we would, as the district court recognized, elevate the infinitude of worker dissatisfactions with supervisors to a constitutional plane.

The Supreme Court has warned us to guard against "attempt[s] to constitutionalize the employee grievance." *Connick*, 461 U.S. at 154. Indeed, Hamlette's comments fall squarely within the framework that *Connick* established for complaints of a purely private nature. First, Hamlette "did not seek to inform the public that [the VDOC officers were] not discharging [their] governmental responsibilities." *Id.* at 148. Second, he did not "seek to bring to light actual or potential wrongdoing or breach of public trust." *Id.* Third, Hamlette's complaint, "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." *Id.*

The same conclusion obtains from the "form and context," *id.*, of Hamlette's complaint. As the Supreme Court has emphasized, "[t]he forum in which a petition is lodged will be relevant to the determination of whether the petition relates to a matter of public concern." *Guarnieri*, 131 S. Ct. at 2501. In *Guarnieri*, the Court applied *Connick*'s analysis of retaliation claims under the Speech Clause of the First Amendment to similar claims brought under the Petition Clause. *Id.* at 2500. The Court stressed that the right of a public employee "to participate as a citizen, through petitioning activity, in the democratic process . . . is not a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." *Id.* at 2501. The Court reminded the lower courts that a "petition filed with an employer using an internal grievance procedure in many cases will not seek . . . to advance a political or social point . . . beyond the employ-

ment context." *Id.* The point of filing a claim through an internal employment dispute resolution system is to address "the government in its capacity as the petitioners' employer, rather than its capacity as their sovereign." *Id.* at 2506 (Scalia, J., concurring in part and dissenting in part). And the relief such a grievance process offers is typically redress of a "purely private concern, [for which] the employee's First Amendment interest must give way." *Id.* at 2500 (maj. op.).

Thus it is quite relevant that Hamlette chose to make these comments in the context of the VDOC EEO process. In contrast to a letter to a local newspaper, *see Pickering*, 391 U.S. at 564, Hamlette's speech through "an internal grievance procedure" demonstrates that he does "not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Guarnieri*, 131 S. Ct. at 2501. An employee like Hamlette who seeks primarily resolution of his personal situation through an employer-provided grievance process simply does not speak with the civic intent necessary to invoke the First Amendment.

## C.

Our confidence in the conclusion that this speech was not on a matter of public concern is bolstered by comparison of the facts of this case to other decisions in which this court has concluded that employee speech merited First Amendment protection.

First, in *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996), this court concluded that a letter of complaint from an association of African-American law enforcement officers to their supervising sheriff spoke to matters of public concern. Unlike this case, the complaint in *Cromer* presented at least five detailed allegations of systemic racial discrimination. *See id.* at 1325 (listing "(1) ineffective minority recruitment efforts, (2) lack of opportunity for black officers to cross-train in and transfer into prestigious units, such as white collar and major

crimes, (3) lack of promotional opportunities for blacks and loss of faith in the promotion process, (4) methods of investigation by the all-white internal affairs unit that caused racial polarization, and (5) favoritism to white officers in the allocation of new equipment"). This court noted that these complaints of racial discrimination were not focused on a particular individual's situation, but rather "prompted an expression of concern about the inability of the sheriff's office to carry out its vital public mission effectively." *Id.* at 1325-26. Similarly, the fact that the letter "was delivered in the context or circumstance of a group complaint" emphasized the fact that it "was not the expression of a single disgruntled employee about a personal employment dispute." *Id.* at 1326.

Here, while some of Hamlette's complaints referred to the disciplining of inmates, his concern was not expressed in terms of a breakdown in effective prison management, but rather focused on his personal displeasure with his supervisors. These highly individualized concerns stand in sharp contrast to the complaint in *Cromer*, which addressed department-wide procedures, made outside an employee grievance channel, and represented the concerns of a larger group of officers within the department.

Second, in *Campbell v. Galloway*, 483 F.3d 258 (4th Cir. 2007), we proceeded with some caution in evaluating a female police officer's allegations of sexual harassment and gender discrimination, noting that "a complaint about sexual harassment or discrimination is not always a matter of public concern." *Id.* at 268. This court concluded, however, that Campbell had met her burden under *Connick* because she made both complaints as to matters of public safety, such as "that male officers did not back her up on dangerous calls," *id.* at 269, and "complaints about inappropriate conduct directed towards other female [officers]," *id.*, and even toward female "members of the public," *id.* at 270. And we emphasized that "Campbell did not bring the sexual harassment

issues to Chief Galloway's attention in order to resolve her own personal problem[, but] was seeking to challenge the practice within the department as much as she was seeking a resolution of her own complaint." *Id.* As noted, Hamlette's complaint could not be more different. He neither raised issues of equivalent public import nor did he seek anything other than an improvement of his own situation.

Lastly, in *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337 (4th Cir. 2000), we concluded that a fire-fighter's complaints about inadequate training and equipment as well as unsafe procedures during emergency calls were matters of public concern. *Id.* at 353. This court rejected, however, the claim that Goldstein's other complaints of favoritism, which are decidedly similar to those of Hamlette, were of public interest. Like Hamlette, Goldstein alleged that his captain discriminated in issuing crew suspensions and that other policies were "enforced against some but not others." *Id.* We dismissed these "matters of internal policy, favoritism, and other employment-related matters" as "not of public concern." *Id.*

Read together, these portions of *Goldstein* and *Campbell* serve as a useful guide, insofar as they illuminate the boundary between protected speech and personal grievance. Private matters between employers and employees may be the subject of internal controversy, but whether someone's sense of fair play is offended is not the constitutional inquiry. If favoritism crosses a line to the point that imperils the public welfare, such as Campbell's allegation that she was inadequately supported on dangerous police assignments because she was female, then the public would rightly be concerned about the matter. But if favoritism pertains primarily to a single individual, as both here and in *Goldstein*, that is not an issue of constitutional dimension.

## D.

This analysis applies with equal force to Brooks' allegations of favoritism, which are of a similarly individualized

nature to those of Hamlette. But Brooks additionally claims that he was entitled to First Amendment protection because he was named as a potential witness in Hamlette's EEO complaint. This contention is also without merit. Having determined, as discussed above, that Hamlette's complaint was intended solely to address his personal grievances and not any matters of public concern, Brooks' involvement in that complaint does not give rise to a First Amendment claim. *See Arvinger v. Mayor of Baltimore*, 862 F.2d 75, 79 (4th Cir. 1988).

This is not to say that we ignore the importance of protecting complainants and the witnesses they call during official investigations. But as we noted in *Arvinger*, it falls to statutes, not the First Amendment, to protect such speech. For example, 42 U.S.C. § 2000e-3(a) makes it unlawful to discriminate against an employee because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." *Id.* But in the absence of such an "applicable statute or regulation," *Connick*, 461 U.S. at 146, the Constitution by itself does not provide a warrant for "intrusive oversight by the judiciary [of employment decisions] in the name of the First Amendment." *Id.* We therefore affirm the district court's dismissal of Brooks' First Amendment claim.[2]

## III.

It is important to emphasize the precise nature of our holding. A variety of federal statutes and state law causes of action may provide plaintiffs a proper avenue of redress. We do not offer any view on the merits of plaintiffs' claims, but rather

---

[2]Plaintiffs also appeal the district court's dismissal of their state law claim for tortious interference with contract. As the district court found, however, Arthur was acting within the scope of his employment in terminating Brooks and Hamlette. Because Arthur was an agent of the VDOC, he was not a third party capable of interfering with the contract between plaintiffs and the VDOC. *See Brooks v. Arthur*, 2011 WL 3102791, at *15 (W.D. Va. 2011). We therefore affirm the district court's dismissal of this count.

on the way they have chosen to press them. The most basic teachings of the Supreme Court do not permit placement of this case within a *Connick* framework. It is "no defeat for the First Amendment," *id.* at 154, that we do not permit "every criticism directed at a public official . . . [to] plant the seed of a constitutional case." *Id.* at 163. The First Amendment's "aim is the full protection of speech upon issues of public concern." *Id.* at 154. Viewed in the context of the employee-grievance system in which these claims were filed and in comparison to pertinent precedents of both the Supreme Court and this circuit, the personal character of the suit cannot be gainsaid. We do not diminish the significance of personal grievances to the parties involved—indeed the VDOC internally reversed the terminations of Hamlette and Brooks—but private concerns are just that: significant chiefly to the parties involved. The First Amendment demands more. In recognition of "the government's interest in the effective and efficient fulfillment of its responsibilities to the public," *id.* at 150, we must respect the line the Supreme Court has drawn, and plaintiffs' grievances clearly fall on the private side of it.

The judgment of the district court is therefore

*AFFIRMED*.