**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1194**

NORRIS PAUL CAREY, JR.,

Plaintiff – Appellant,

v.

DEPUTY SECRETARY JOANNE THROWE; CAPTAIN EDWARD JOHNSON;
CAPTAIN CHARLES VERNON; ROBERT K. ZIEGLER, Superintendent,

Defendants – Appellees,

and

MARYLAND NATURAL RESOURCES POLICE,

Defendant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
George L. Russell, III, District Judge.  (1:18-cv-00162-GLR)

Submitted:  March 17, 2020                           Decided:  April 30, 2020

Before WILKINSON and KEENAN, Circuit Judges, and Rossie D. ALSTON, Jr., United
States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge
Keenan and Judge Alston joined.

Robin R. Cockey, Ashley A. Bosché, COCKEY, BRENNAN & MALONEY, P.C., Salisbury, Maryland, for Appellant. Andrew M. Winick, HOFMEISTER & BREZA, Hunt Valley, Maryland, for Appellee Captain Edward Johnson. Brian E. Frosh, Attorney General, Roger L. Wolfe, Jr., Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Annapolis, Maryland, for Appellees.

WILKINSON, Circuit Judge:

In December 2016 and January 2017, Norris Paul Carey, Jr., then an employee of Maryland's Department of Natural Resources ("DNR"), submitted to a local website two anonymous blog posts about Edward Johnson, then Captain of the Internal Affairs Unit of the Maryland Natural Resources Police ("MNRP"). To say the least, the posts were not flattering. Among other things, they collected screenshots from Johnson's private Facebook page that showed photos of Johnson posing with scantily-clad women and various comments that he had made about gun violence. In the months that followed, though, it was Carey whose life took a turn. He was fired from the DNR, his Law Enforcement Officer Safety Act ("LEOSA") card to carry a concealed firearm was rescinded, and he was disparaged on social media. As Carey tells it, these actions were all part of a concerted and unlawful effort by persons at the DNR and MNRP to retaliate against him for the blog posts. The district court disagreed, calling the whole business the product of a personal spat and dismissing Carey's suit for failure to state a claim upon which relief may be granted. For the reasons that follow, we affirm.

I.

Carey served in the Maryland Natural Resources Police for twenty-six years.[*] For most of his tenure, Carey worked in field enforcement, performing tasks like polygraph examinations, before retiring on December 31, 2013. Three months before retiring, Carey

---

[*] Because this case follows the grant of a motion to dismiss, we "accept as true all of the factual allegations contained in the complaint." *Adams v. Ferguson*, 884 F.3d 219, 222 (4th Cir. 2018) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

became involved in an internal MNRP investigation concerning a missing M16 patrol rifle. During this probe, Captain Johnson interviewed Carey on the suspicion that Carey had improperly talked to a key suspect in the investigation—the first chapter in what would become a heated conflict between the two. Carey denied this, and the MNRP eventually dropped the matter. According to Carey, he ultimately retired in good standing.

Carey joined the Maryland Department of Natural Resources in a civilian capacity in August 2015. As one might suspect from their names, the MNRP and DNR are related; the former is the law enforcement arm of the latter. Carey was hired by the DNR as an at-will employee for their Boat Tax Enforcement Unit. While his contract was set to end on August 8, 2017, Carey's supervisor told him it would be renewed.

During his time with the DNR, Carey received a certification card that allowed him to carry a concealed firearm. Maryland issued this card to Carey pursuant to the Law Enforcement Officer Safety Act, a federal law that provides for retired law enforcement officers to carry concealed firearms under certain conditions. 18 U.S.C. § 926C. Two of these conditions are that the officer (i) retired in "good standing," and (ii) currently holds a certain form of state-issued identification (*i.e.*, in Maryland, the "LEOSA card").

But Carey's tenure with the DNR ended abruptly. On May 25, 2017, Joanne Throwe, the DNR Deputy Secretary, and Mike Lathrom, a Corporal within the MNRP, pulled Carey aside and told him that his contract had been terminated. Carey asked for an explanation but was never given one. It seems, though, he was not fired for cause.

To Carey, the reason for his termination became apparent: the defendants were retaliating against him for two blog posts that he submitted anonymously to the Salisbury

4

News Blog, a popular website among local first responders. In those posts, Carey went after Captain Johnson. Carey submitted the first one in December 2016 (the "December post"). There, he copied the MNRP's Code of Conduct and Agency Values and placed it alongside a series of screenshots from Johnson's Facebook. Those screenshots included photos of scantily-clad women (some with Johnson and some on their own) in provocative poses and the back of a man wearing a jacket associated with a motorcycle club.

Carey submitted his second post in January 2017 (the "January post"). There, Carey displayed not only some of the same provocative photos from Johnson's Facebook, but also added a series of screenshots where Johnson boasted about his gun collection and seemed to make light of gun violence. For instance, one photo showed Johnson's AR-15 with him commenting, "I don't think the game warden can catch us . . . LOL," J.A. 65, and another showed a picture of a skull with a bullet hole through its forehead, with Johnson remarking that it had a "45 caliber [headache]," *id.* at 61. The January post also featured certain commentary by Carey. For instance, he wrote that Johnson was "denigrating law enforcement and fanning the flames of an already hostile environment that needs healing" and queried, "what is going on with Maryland Natural Resources Police??" J.A. 61, 66.

Although each of these posts was made anonymously, it seems that word got out about their author. On January 21, 2017, an unknown person commented below the January post: "Since you seem to be protected on this site Paul Carey your deeds will be spread far and wide elsewhere including disparaging the very Department you're still employed by—for now . . . ." J.A. 110. According to Carey, things took a turn for the worst once he was outed as the posts' author. On top of getting fired, Carey alleges that

5

certain DNR and MNRP employees retaliated against him for the posts over two other episodes.

First, on April 28, 2017, MNRP Captain Charles Vernon called Carey to tell him that he had not retired from the MNRP in good standing and needed to return his LEOSA card (which was no longer valid). Confused by this, Carey reached out to the Maryland Police and Correctional Training Commission to check his retirement status. According to Carey, an official there confirmed that he had, in fact, retired in good standing. Carey therefore refused to return his LEOSA card, but he did stop carrying his concealed firearm. For the next few weeks, MNRP officials repeatedly contacted Carey's DNR supervisors to tell them Carey did not retire in good standing and was refusing to return his LEOSA card.

What is more, the tensions that erupted over Carey's posts boiled over into other aspects of his life. By way of background, while Carey was working for the DNR, he was also running a private business where he would offer independent polygraph examinations. As part of this, Carey was hired by the organizers of the White Marlin Open ("WMO"), a local fishing tournament, to conduct polygraph exams of tournament winners to ensure there was no foul play. For reasons not relevant here, the WMO soon descended into litigation, and Carey was later called as a witness to discuss his post-tournament polygraph exam. On May 8, 2017, about two weeks before Carey was fired by the DNR, Captain Johnson emailed him to ask for the date and time of the White Marlin trial—an email Carey understood as "threatening" because Johnson had no reason to contact him about his work in this litigation "other than to try to intimidate him." J.A. 114. The next day, an anonymous post appeared on the Salisbury News Blog that read: "Consider the drama in

6

court when they learn one of the polygraph examiners has a less than stellar background and lacks integrity." *Id*. at 115. Finally, and most significant, one day after the WMO trial ended, but about three weeks after Carey was fired, Johnson commented on the WMO's Facebook page: "Too bad one of the polygraphers—Paul Carey, has the integrity of a lifer on death row." *Id.* at 116.

In January 2018, Carey filed this lawsuit against the MNRP, Deputy Secretary Throwe, Captain Johnson, and Captain Vernon. That May, Carey amended his complaint to add as a defendant Robert Ziegler, the MNRP Superintendent responsible for overseeing the LEOSA certification program, and to remove the MNRP as a defendant. Carey raised three claims. First, Carey brought a First Amendment retaliation claim under 42 U.S.C § 1983 against Throwe, Johnson, and Vernon, arguing that he was unlawfully terminated for exercising his free speech rights. Second, Carey brought a claim, also under § 1983, against Ziegler and Vernon, alleging that they had interfered with his right to carry a concealed firearm under LEOSA by improperly rescinding his LEOSA card. Third, Carey brought a defamation per se claim against Johnson for the disparaging comment that he put on the WMO's Facebook page.

In the months that followed, the defendants filed motions to dismiss and/or for summary judgment and, in January 2019, the district court granted their motion to dismiss the entire lawsuit. *Carey v. Throwe*, No. GLR-18-162, 2019 WL 414873 (D. Md. Jan. 31, 2019). The court held that none of Carey's three claims could get out of the starting gate due to at least one fundamental defect. The court dismissed the First Amendment retaliation claim on the ground that neither of the Salisbury News posts at issue involved a

7

"matter of public concern," a prerequisite to bringing such a suit. Next, the court dismissed Carey's LEOSA claim, brought under § 1983, because LEOSA is not privately enforceable under that statute. Lastly, the court dismissed Carey's defamation per se claim, holding that Johnson's comment was nothing more than a hyperbolic opinion. This appeal followed.

## II.

We review the district court's grant of a motion to dismiss de novo. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 307 (4th Cir. 2007). To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). We take all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff, but "we need not accept the legal conclusions drawn from the facts, and we need not accept as true unwarranted inferences, unreasonable conclusions or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (internal quotation omitted).

## III.

We first consider Carey's First Amendment claim for retaliatory discharge. Carey alleges that his posts are protected by the First Amendment, and that it was therefore unlawful for public officials at the DNR and MNRP to terminate him for publishing them.

### A.

It is well settled that public employees may not "constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). At the

8

same time, though, public employees "must accept certain limitations on [their] freedom" so that a government workplace can provide public services in an efficient and effective manner. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); see also *Connick v. Myers*, 461 U.S. 138, 149 (1983) (emphasizing that the First Amendment "does not require a public office to be run as a roundtable for employee complaints over internal office affairs").

In light of this balance, when a public employee is punished by his employer (the government) for his speech, we use a three-part test to assess the propriety of that adverse action. First, at the outset, we consider "whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). Second, if the former, "we evaluate whether the employee's interest in First Amendment expression outweighs the employer's interest in the efficient operation of the workplace." *Liverman v. City of Petersburg*, 844 F.3d 400, 409 (4th Cir. 2016). And finally, "we decide whether the protected speech was a substantial factor in the employer's decision to take adverse employment action." *Ibid.*

This appeal concerns the threshold prong of this inquiry—whether the speech at issue touches on a matter of public concern. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc). By contrast, if the speech at issue merely implicates a "purely personal" topic, the First Amendment does not apply and our analysis comes to an end. *Liverman*, 844 F.3d at 406. As such, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal

9

interest do not constitute speech about matters of public concern," and therefore cannot sustain a First Amendment retaliation claim. *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992). In deciding whether certain speech falls on the "public concern" or "purely personal" side of the line, we naturally look to the "content, context, and form of the speech at issue in light of the entire record." *Urofsky*, 216 F.3d at 406.

## B.

Carey submits that the December and January posts both involve matters of public concern. To him, they expose misbehavior on the part of a Captain in the MNRP and, by extension, the MNRP writ large. The district court disagreed, dismissing his claim on the ground that the posts involved nothing more than the sort of personal grievance that does not garner First Amendment protection in this context. *Carey v. Throwe*, No. GLR-18-162, 2019 WL 414873, at *5 (D. Md. Jan. 31, 2019). The district court got it right. As set out below, the touchstone for deciding if speech involves a matter of public concern is whether its content implicates the public welfare. Neither one of Carey's posts, however, meets this standard. The posts show Johnson's behavior to be boorish, tasteless, and boastful. But neither post impeaches Johnson's conduct of his professional duties or raises a matter of public interest. Rather, at bottom, they simply add up to an airing of personal grievances, and an expression of Carey's (no doubt correct) belief that Johnson's off-duty conduct was unbecoming of an MNRP officer.

It is helpful to take each of Carey's posts in turn. As noted, the December post copied the MNRP Code of Conduct and Agency Values and placed it alongside a series of sexist photos and offensive comments from Johnson's Facebook page. See, *e.g.*, J.A. 53

10

(screenshot of Johnson writing, "I tried to stay out of trouble in Vegas. Damn . . . but that strip search!" next to image of him with scantily-clad women in police officer costumes). The gist of Carey's first post, as best we can tell, is that Johnson's personal online presence fell below the MNRP's Code of Conduct. But while it may be a matter for departmental discipline, this kind of grievance misses the constitutional mark. Under our precedents, the private boorishness of a public employee, without more, does not rise to a constitutionally cognizable matter of public concern. See *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 344 (4th Cir. 2017) (finding former firefighter's "'like' [on Facebook] of [an] image depicting an elderly woman raising her middle finger and entitled 'for you Chief'" was not speech on matter of public concern). And while Carey asserts his workplace speech rights under *Connick*, it bears note that Johnson has an expressive right of his own—namely, the right to speak freely in an off-duty role, even in egregious taste.

Put simply, the December post fails to discuss any issue that the public is objectively "likely to be truly concerned with." *Arvinger v. Mayor of Baltimore*, 862 F.2d 75, 79 (4th Cir. 1988) (citation and internal quotation marks omitted). Of course, Johnson's Facebook speech is not insulated automatically from *Connick* challenge simply because it appeared on Facebook. Social media, as its name implies, has a dual private/public character. It may be someone's private page, but its postings often travel far and wide. Some will doubtless raise matters of public concern. But controversial and tasteless speech, even by prominent public figures and employers, abound on social media, and to have such comments invariably seed a lawsuit would simultaneously compromise our most precious values of both privacy and speech.

11

Here, nothing in Carey's December post suggests that Johnson was not performing his professional duties in an adequate manner, or that he otherwise had adversely impacted the public welfare. Rather, the post simply boils down to "a disagreement about the propriety of posting controversial photos on Facebook." *Carey*, 2019 WL 414873, at *5. Put another way, it concerns a "quintessential interpersonal dispute," with no immediate connection to the public well-being. *Id.* at *4; see also *Brooks v. Arthur*, 685 F.3d 367, 374-75 (4th Cir. 2012) (plaintiff's "personal displeasure with his supervisors" was not speech on matter of public concern because it "was not expressed in terms of a breakdown in effective prison management").

The January post has similar problems. Recall that this post had similar material regarding Johnson with scantily-clad women, but it also highlighted content where Johnson bragged about his gun collection or made light of gun control. See J.A. 61, 63-65. To be sure, the post captures a tone from Johnson that falls short of the sobriety owed such a topic. However, as with the December post, Johnson's churlish taste, on its own, does not rise to the level of professional misconduct—let alone a matter of public concern. See, *e.g.*, *Campbell v. Galloway*, 483 F.3d 258, 268 (4th Cir. 2007) (recognizing that not every issue of professional misconduct is inherently a matter of public concern).

Carey argues otherwise, noting that certain comments made by Johnson online might indicate a threat to the public safety. See J.A. 65 (screenshot of Johnson writing, "I don't think the game warden can catch us . . . LOL," next to photo of his AR-15). Though a closer question, we think such statements do not rise to a level of public concern. Taken in context, Johnson's remarks amount to empty bombast, or "bar stool braggadocio." See

12

*United States v. Alvarez*, 567 U.S. 709, 737 (2012) (Breyer, J., concurring in the judgment). There is nothing in the post to convey that Johnson posed any genuine threat to the public safety, or that his conduct might predictably affect the public in some way. Indeed, as the district court recognized, nowhere does the January post suggest that "Johnson failed to comply with agency protocol for gun safety or that he in any way endangered the public's safety." *Carey*, 2019 WL 414873, at *5; see also *Goldstein v. Chestnut Ridge Vol. Fire Co.*, 218 F.3d 337, 353 (4th Cir. 2000) (holding a firefighter's complaint listing twelve specific claims that "safety regulations were being violated" was matter of public concern).

Our holding on this point is, however, quite narrow. Posts involving firearms could well implicate matters of public safety or portend a proclivity to lawless violence. It is axiomatic that employee speech exposing such impending dangers would clear *Connick*'s bar of public concern. That is not this case, however. All in all, both of Carey's posts concern nothing more than purely personal speech, as they are devoid of any content that rises to a level of public concern. Of course, in a colloquial sense, the public very well may be interested in the lewd or boorish private behavior of a prominent public employer (or anyone else, for that matter). But this sort of curiosity is hardly a matter of "public concern" for First Amendment purposes. See *Connick*, 461 U.S. at 149 (stressing "every criticism directed at a public official . . . [does not] plant the seed of a constitutional case"). Rather, for speech to concern an issue of constitutional dimension, it must affect the public welfare in some cognizable way. See *Brooks*, 685 F.3d at 373 (warning against "elevat[ing] the infinitude of worker dissatisfactions" "to a constitutional plane"). As we have made plain, Carey's posts fall short of making this necessary connection.

13

Carey tries to avoid this conclusion by collapsing any distinction between Johnson and the MNRP. In essence, he maintains that Johnson's conduct is innately part-and-parcel of the MNRP's conduct, and that his unseemly Facebook page must *necessarily* bear on the agency as a whole. Not so. We have never held that a public employee's behavior, whether on-the-job or off, automatically imputes to his employer; otherwise, virtually anything involving a public employee would, by definition, be a matter of public concern. See *Brooks*, 685 F.3d at 374-76. Instead, before attributing a single employee's conduct to the governmental agency where he works, we look for concrete indicators that the employee's behavior is actually emblematic of a larger problem within the agency (and, as such, is a matter of public concern). *E.g.*, *Campbell*, 483 F.3d at 268-70 (detailing specific ways that private sexual harassment complaint related to department-wide policies toward women); *Cromer v. Brown*, 88 F.3d 1315, 1325-26 (4th Cir. 1996) (identifying five cases of systemic discrimination to buttress racial bias complaint). But here, Carey offers no specifics. He does not provide a single concrete example of how Johnson's social media presence has affected the MNRP. In fact, he does not seem to offer any concrete indication of any particular cultural or systemic problem within the department.

Indeed, rather than the sort of specifics we ordinarily require, Carey offers only attenuated links between Johnson's private conduct and the MNRP. For one, Carey avers that because Johnson was Facebook "friends" with a high-ranking MNRP officer, the MNRP must have known about (and approved of) his conduct online. This misses the mark. Johnson never posted anything in an official capacity or held himself out as speaking for the MNRP. Further, public officials are under no duty to actively monitor the social

14

media accounts of their innumerable employees in order to guard against suits like this one. Therefore, before ascribing Johnson's private conduct to the MNRP, we need more than some speculative *possibility* that MRNP officials in some way approved of what he posted.

It may be that Carey sincerely objects to how Captain Johnson has chosen to behave on social media. But "whether someone's sense of fair play is offended is not the constitutional inquiry." *Brooks*, 685 F.3d at 375. Nor does that inquiry turn, as the district court recognized, on whatever bad blood existed between Carey and Johnson. Instead, for speech to rise to the level of public concern, it generally must involve at least some objective nexus to the public welfare, beyond the simple fact that its subject happens to be a public employee. See *Campbell*, 483 F.3d at 268. The posts here do no such thing. We thus affirm the district court's dismissal of Carey's First Amendment retaliation claim.

IV.

Carey next argues that the defendants violated his right to carry a concealed firearm under the Law Enforcement Officer Safety Act, and that he is accordingly entitled to relief under 42 U.S.C. § 1983. The district court rejected this claim, reasoning that LEOSA was not privately enforceable under § 1983. We agree. The plain text of LEOSA forecloses Carey's argument. To boot, basic principles of federalism compel the same conclusion.

A.

LEOSA permits retired law enforcement officers, under certain conditions, to carry a concealed firearm notwithstanding most state or local laws. Specifically, LEOSA says:

> Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified retired law enforcement officer and who is carrying the identification required by subsection (d) may

carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

18 U.S.C. § 926C(a). In other words, for a retired law enforcement officer to fall within LEOSA's ambit, he must satisfy two conditions. First, he must be "qualified," under the Act. *Id.* at § 926C(c). Second, he must carry certain identification. *Id.* at § 926C(d). LEOSA's identification requirement can be satisfied in one of two ways. Under the first option, a person must have a single state-issued credential that (i) includes a photographic identification affirming he has worked as a law enforcement officer, and (ii) indicates he has passed the requisite firearms training and testing. LEOSA's second option essentially covers the same information over two documents. Maryland has decided to go with option one, and provides its qualified retired law enforcement officers a single "LEOSA card."

Carey's claim is that he is objectively a "qualified" retired law enforcement officer under LEOSA, satisfying the Act's first condition, but that defendants Vernon and Ziegler have improperly rescinded his state-issued identification out of retaliation, preventing him from satisfying its second. He seeks relief under § 1983 to get his LEOSA card reinstated and vindicate what he says is his right under the Act to carry a concealed firearm. J.A. 119.

Carey's claim must fail because § 1983 is not an available remedy for purported violations of LEOSA. "Section 1983 imposes liability on anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution and laws." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (internal quotation marks omitted). "In order to seek redress through § 1983," though, "a plaintiff must assert the

16

violation of a federal *right*, not merely a violation of federal *law*." *Ibid.* Whether a statute creates such a right enforceable under § 1983 turns on three factors identified by the Supreme Court in *Blessing*:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340-41 (internal citations omitted). The Supreme Court has also clarified that the *Blessing* factors collectively amount to a high bar, and that "anything short of an unambiguously conferred right" cannot sustain a private remedy under § 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). After all, when Congress wants to create a private cause of action, it knows how to do so expressly. See *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.") (citation and internal quotation marks omitted).

LEOSA does not satisfy this purposefully demanding inquiry. For starters, the Act lacks any express rights-creating language. *Gonzaga*, 536 U.S. at 287 (recognizing "the provisions [at issue] entirely lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights"). As noted, LEOSA states that certain qualified officers "may" carry concealed firearms under certain circumstances. 18 U.S.C. § 926C(a). This use of precatory rather than mandatory language is important. See *United States v. Rodgers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a

17

statute, usually implies some degree of discretion."). Indeed, when Congress intends to create private rights, it often speaks in clearer and more compulsory terms. See, *e.g.*, 20 U.S.C. § 1415(i)(2)(A) (stating that the relevant party "shall have the right" to bring a civil action under the statute). Moreover, LEOSA lacks any express remedial provision, either directly under the statute or indirectly by cross-reference to § 1983. This omission too is telling because Congress passed LEOSA after the *Blessing* and *Gonzaga* Courts made apparent that a statute would need to be unambiguous for it to be enforceable under § 1983. See generally *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 330 n.* (2015).

With regard to the three factors laid out in *Blessing*, therefore, LEOSA most directly falters on its third requirement because the Act does not "unambiguously impose a binding obligation on the States." 520 U.S. at 341. As noted, LEOSA places two burdens before retired law enforcement officers seeking concealed carry privileges: they must be "qualified," as defined by the Act, and they must be carrying certain identification. Critically, however, LEOSA contains no language—none—obligating states to issue any identification at all.

In fact, the plain text of LEOSA conveys the exact opposite, committing entirely to the discretion of the states the decision of *whether* to issue identification and, should they choose to do so, *what* they may require of individuals seeking such a credential. For one, LEOSA makes clear that the photographic identification described above must be "issued *by the agency* from which the individual separated from service as a law enforcement officer." 18 U.S.C. §§ 926C(d)(1) (emphasis added); 926C(d)(2)(A) (same); see also *id.* at § 926C(c)(5) (noting identification may be contingent on state or agency mental health

determination).  Yet the Act says nothing as to whether, when, or how an agency must issue such a credential—rather, these decisions remain entirely with the state.

Further, LEOSA lays bare that states have total discretion over setting the standards and procedures, if they wish, for qualifying to carry a concealed firearm under the Act.  See *id.* at § 926C(d)(1) (requiring identification indicating officer has met "the active duty standards for qualification in firearms training *as established by the agency*") (emphasis added); § 926C(d)(2)(B) (requiring same for either "the active duty standards for qualification in firearms training[] *as established by the State*" or "if the State has not established such standards, standards set *by any law enforcement agency within that State* to carry [the same sort of] firearm") (emphases added).  Nowhere does LEOSA have any language requiring states to set standards in a particular way or to certify officers under certain conditions.  Rather, LEOSA's text imposes no limit on states' extant regulatory authority over local firearms.

Carey intimates that we should infer such a binding limit from the Act's preemption provision.  See Appellant's Op. Br. at 27-28 (citing *DuBerry v. District of Columbia*, 824 F.3d 1046 (D.C. Cir. 2016)).  It makes little sense, the argument goes, for Congress to preempt state and local law if states are nonetheless still free to prevent "qualified" officers from carrying concealed firearms by withholding the requisite identification.  But we think this reads the preemption provision for more than it is worth, and gives LEOSA a sweeping scope that Congress never intended.  LEOSA is instead best read as accomplishing a far simpler object.  As it stands today, and as it stood when Congress passed LEOSA, states do not have to recognize concealed carry permits issued by other states.  *Henrichs v. Ill.*

19

*Law Enforcement Training & Standards Bd.*, 306 F. Supp. 3d 1049, 1058 (N.D. Ill. 2018). LEOSA carves out a small exception to that norm. Specifically, the Act preempts most state and local laws that could be used to criminally prosecute a LEOSA-qualified officer for carrying a concealed firearm across state lines. See *id.* at 1057-58 (collecting cases for this proposition). In other words, under no circumstances does LEOSA obligate any state to *issue* its own concealed carry permit; but it does generally prevent states from prosecuting out-of-state officers who choose to carry under a LEOSA-compliant permit *already issued*.

All told, LEOSA cannot be read as "unambiguously impos[ing] a binding obligation on the States" to issue concealed carry permits, *Blessing*, 520 U.S. at 341, and thus cannot sustain a private remedy here under § 1983. By our count, the Eleventh Circuit and every district court to address the question have reached the same conclusion. See *Burban v. City of Neptune Beach*, 920 F.3d 1274 (11th Cir. 2019); *Burban v. City of Neptune Beach*, No. 3:17–cv–262–J–34JBT, 2018 WL 1493177, at *6 (M.D. Fla. Mar. 27, 2018) (collecting cases). *But see DuBerry*, 824 F.3d at 1055. In light of LEOSA's plain language, we readily join this emerging consensus.

B.

Basic federalism principles confirm what the text and structure of LEOSA compel. It is a cardinal rule of statutory interpretation that Congress does not ordinarily intend to upset the Constitution's "healthy balance of power between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). But Carey's proffered

20

interpretation of LEOSA would have Congress contravening this balance at least twice over, which only reinforces our conclusion that LEOSA should be given its natural reading.

First, to put it plainly, Carey's interpretation of LEOSA presents an inescapable and fatal anticommandeering problem. As he would have it—indeed, as he *must* have it in order to proceed under § 1983—LEOSA would obligate states to create and issue the sort of identification required under the Act. But Congress can do no such thing. It is well settled that the Constitution contains "a fundamental structural decision . . . to withhold from Congress the power to issue orders directly to the States." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018). In other words, because the Constitution only "confers upon Congress the power to regulate individuals, not States," *New York v. United States*, 505 U.S. 144, 166 (1992), Congress lacks the power to "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997). For this reason, the Supreme Court struck down a federal statute that attempted to force state law enforcement officers to conduct background checks as part of a federal firearm regulatory program. *Printz*, 521 U.S. at 933-35.

Likewise here. On Carey's reading, LEOSA would force state law enforcement agencies to issue certain identification as part of a federal concealed carry scheme. But this is the exact sort of dragooning that the anticommandeering doctrine forbids. See *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981). Curiously, Carey argues that his reading of LEOSA harbors no constitutional infirmities *on these facts* because Maryland has voluntarily decided to issue the sort of identification required under

21

the Act. This misses the point. The anticommandeering doctrine turns on the nature of the federal ask, not the existence vel non of state acquiescence. See *Printz*, 521 U.S. at 929-30. Put otherwise, the doctrine is about the limits of federal power—limits that are fixed by the Constitution. *Murphy*, 138 S. Ct. at 1476. It is thus immaterial whether states voluntarily choose to be part of a federal program, if Congress lacked the power to create such a program in the first place. Cf. *INS v. Chadha*, 462 U.S. 919, 944 (1983).

In short, Carey would have us turn the doctrine of constitutional avoidance on its head, and strain to adopt a reading of LEOSA that would render the Act unconstitutional, even though giving the statute its most natural interpretation would not. We, of course, decline to do so. See *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 448-49 (1830) (Story, J.) ("No court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the [C]onstitution.").

Second, even if we were to put the anticommandeering problem to the side, Carey's interpretation of LEOSA would run aground for a separate reason. At bottom, Carey's preferred reading of the Act would bring about a stark intrusion by the federal government into the traditional police power of the states over firearms regulation. Worse, Carey presses this reading even though the Act lacks any clear indication that Congress intended such a result—something we ordinarily require when a statute would alter the usual balance of state and federal power. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989).

The regulation of firearms has been at the heart of the states' police power since the Founding. See *United States v. Cruikshank*, 92 U.S. 542, 553 (1875); see also *Aymette v.*

22

*State*, 21 Tenn. (2 Hum.) 154, 159 (1840) (upholding state concealed weapon ban on police power grounds); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & Hist. Rev. 139, 155-65 (2007) (detailing early history of state regulations).  In fact, there is perhaps "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and the vindication of its victims."  *United States v. Morrison*, 529 U.S. 598, 618 (2000); see also *United States v. Bass*, 404 U.S. 336, 349-50 (1971).

Carey's interpretation of the Act would amount to a marked assault on the traditional authority of the states over firearm regulations.  Most directly, as noted, Carey would have the Act require all states, regardless of whether they permit concealed carry in general, to issue concealed carry permits to certain individuals based upon criteria set solely by the federal government.  But that is not all.  If LEOSA was privately enforceable, individual citizens would be able to litigate innumerable gun policy issues in the federal courts, rather than through the local political process.  As one example, consider how the Act defines "law enforcement officer" capaciously, including those who "supervise the prosecution . . . of any person[] for any violation of law" and "engage in . . . the incarceration of any person" for the same.  18 U.S.C. § 926C(c)(2).  Read naturally, LEOSA leaves it to states to decide who meets these definitions.  But on Carey's view, every retired district attorney or corrections officer may petition a federal judge for the right to have a concealed firearm, no matter what the state legislature prefers.  And in light of LEOSA's sparse text, that judge will have little to make his decision besides his own policy preference.

23

Ordinarily, when a statute is presented as containing a federal coup of this dimension, we take added steps to ensure that Congress intended such a result. See *Bond v. United States*, 572 U.S. 844, 856-60 (2014). Indeed, the Supreme Court has emphasized time and again that a statute should not be read as fundamentally altering the traditional balance of state and federal power without a clear statement or indication to the contrary. *Gregory*, 501 U.S. at 460 (requiring "unmistakably clear" text) (internal quotation omitted); *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 785 (1991); *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 243 (1985); *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); see also *Cort v. Ash*, 422 U.S. 66, 78 (1975) (asking whether "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law"). After all, the touchstone for statutory interpretation is congressional intent, and we do not readily presume that Congress intended to materially undercut the Constitution's federalist design.

The same interpretive principles should inform our analysis when assessing whether a statute is privately enforceable under § 1983. See *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 645-46 (1979) (Powell, J., concurring). Recall that the Supreme Court has made clear that nothing "short of an unambiguously conferred right [may] support a cause of action brought under § 1983." *Gonzaga*, 536 U.S. at 283. To the extent this standard permits a gradation, we think it sound to apply its most exacting lens when inferring a private remedy would upset the usual balance of state and federal power. Said otherwise, to borrow from the *Gregory* Court, if finding a remedy under § 1983 would

24

intrude on a historic state prerogative, it must be "unmistakably clear" that Congress intended for the statute at issue to be privately enforceable in such a manner. And it should go without saying at this point that LEOSA contains no such indication—indeed, as explained above, everything about its text and structure conveys the opposite.

"[W]here the text and structure of a statute provide no indication that Congress intend[ed] to create new individual rights, there is no basis for a private suit" under § 1983. *Gonzaga*, 536 U.S. at 286. So goes LEOSA. In short, the text, structure, and constitutional context of the Act all reveal that LEOSA does not give rise to a right privately enforceable under § 1983. We therefore affirm the district court's dismissal of Carey's LEOSA claim.

V.

Finally, we take up Carey's defamation per se claim. This count is based solely on the comment that Johnson posted on the White Marlin Open's Facebook page, which read: "Too bad one of the polygraphers—Paul Carey, has the integrity of a lifer on death row." J.A. 116.

As common sense would dictate, this is a far cry from what is necessary to haul someone into court, and is rather just another installment in some longstanding feud between Carey and Johnson. See J.A. 83-84, 92-94 (detailing the two's fraught history). For a statement to be actionable as defamation under Maryland law, it must "tend[] to expose a person to public scorn, hatred, contempt[,] or ridicule." *Seley-Radtke v. Hosmane*, 149 A.3d 573, 581 (Md. 2016) (citation and internal quotation marks omitted). Moreover, as a general matter under the First Amendment, a defamatory statement must also be something "susceptible of being proved true or false." *Milkovich v. Lorain Journal Co.*,

497 U.S. 1, 21 (1990). Naturally, statements of opinion do not usually meet this definition. But not always. In some cases, an expression of opinion may be defamatory if it clearly implies "an assertion of objective fact." *Id.* at 18.

That does not describe Johnson's comment. To the contrary, his remark on Facebook makes use of precisely the "sort of loose, figurative, or hyperbolic language" that is the stuff of everyday life in a free society, and which may not support a defamation claim. *Milkovich*, 497 U.S. at 21. Johnson's opinion does not contain any assertion of objective fact; it would strain even the most creative mind to figure how it could be proven true or false. Perhaps anticipating these problems, Carey urges us to take a broader lens and place the Facebook comment in context. See Appellant's Op. Br. at 30-31 (suggesting that the statement, in context, implies that Carey lied in holding himself out as a qualified polygraph expert in the White Marlin litigation). But this just makes a bad claim worse. Carey has decided to lodge a defamation *per se* claim, which means that we are to look only to the words of the immediate statement—not surrounding circumstances. *Indep. Newspapers, Inc. v. Brodie*, 966 A.2d 432, 448 (Md. 2009). Not that it would make a difference either way, but we are bound here to stay within the four corners of Johnson's Facebook post. As such, we affirm the district court's dismissal of this claim.

VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

26