**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 21-1449**

─────────────

SOUTHERN POWER COMPANY,

        Plaintiff – Appellant,

v.

CLEVELAND COUNTY,

        Defendant – Appellee.

─────────────

Appeal from the United States District Court for the Western District of North Carolina, at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:20-cv-0013-MR-WCM)

─────────────

Argued:  December 9, 2021                    Decided:  January 14, 2022

─────────────

Before WILKINSON, MOTZ, and HARRIS, Circuit Judges.

─────────────

Affirmed by published opinion.  Judge Motz wrote the opinion, in which Judge Wilkinson and Judge Harris joined.

─────────────

**ARGUED:**  Christopher G. Smith, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, LLP, Raleigh, North Carolina, for Appellant.  Grant B. Osborne, WARD & SMITH, PA, Asheville, North Carolina, for Appellee.  **ON BRIEF:** Michael J. Parrish, Christopher S. Edwards, WARD & SMITH, PA, Asheville, North Carolina; Timothy K. Moore, TIM MOORE, ATTORNEY AT LAW, P.A., Kings Mountain, North Carolina; Martha R. Thompson, OFFICE OF THE COUNTY ATTORNEY, Shelby, North Carolina, for Appellee.

─────────────

DIANA GRIBBON MOTZ, Circuit Judge:

A power company brought this action seeking a declaration that its agreement with a North Carolina county constituted an enforceable contract. Because the county never waived its governmental immunity from suit, we must affirm the judgment of the district court holding that the county enjoys immunity from the company's claims.

I.

This case could be the subject of a law school examination. It arises from an "Incentive Development Agreement" ("the Agreement") that Southern Power Co. and Cleveland County, North Carolina, signed on July 24, 2007.[1] The Agreement provided that if Southern Power built and operated a natural gas plant — a decision left in the Company's sole discretion — the County would make substantial cash payments to the Company. On August 30, 2007, thirty-seven days after the parties signed the Agreement, the North Carolina legislature enacted a new law. *See* N.C.G.S. § 158-7.1(h); 2007 N.C.S.L. 515 § 7 (hereinafter "Subsection H"). That law imposes more stringent requirements on such agreements, including a mandate that they include a recapture provision allowing a municipality to recover cash incentives already paid if the private entity breaches the agreement.

In November and December of 2008, Southern Power secured contracts to supply utility companies with electricity produced at the plant. Am. Compl. at 10. Southern

---

[1] Because this case comes before us on a motion to dismiss, we take the facts alleged in the Amended Complaint as true and draw all reasonable inferences in favor of the plaintiff, Southern Power. *Carey v. Throwe*, 957 F.3d 468, 474 (4th Cir. 2020).

Power then asked the County to reaffirm its commitment to the Agreement. *Id*. at 10–11. In response, the County adopted a resolution at its January 6, 2009, meeting stating that Southern Power's proposed plant "falls under the terms of that [July 24, 2007,] incentive agreement and contractually the County is committed to the incentive grants set forth in that agreement." *Id.*

Southern Power broke ground on the plant in October 2009 and began commercial operations in December 2012. *Id.* at 11. The County, however, refused to pay Southern Power any cash incentives, arguing that the Agreement failed to comply with Subsection H. Then, Southern Power brought this diversity action in the Western District of North Carolina. The district court, adopting the magistrate judge's recommendation, dismissed the case as barred by North Carolina governmental immunity. *See Southern Power Co. v. Cleveland County*, No. 1:20-cv-00013, 2021 WL 1108590 (W.D.N.C. Mar. 23, 2021). Southern Power now appeals.

We review the district court's judgment *de novo*. *AGI Assocs., LLC v. City of Hickory*, 773 F.3d 576, 578 (4th Cir. 2014). And sitting in diversity, we apply North Carolina law. *Id.* at 579. In North Carolina, a municipality generally enjoys immunity from suit. *Meinck v. City of Gastonia*, 819 S.E.2d 353, 357 (N.C. 2018). But "[t]his immunity, often referred to as governmental immunity, can be waived by a municipality in three discrete ways: (1) by entering into a valid contract; (2) by acting in a proprietary capacity; and (3) by purchasing liability insurance." *AGI Assocs.*, 773 F.3d at 578. The first two — contractual waiver and proprietary waiver — are at issue in this case.

3

## II.

We first consider contractual waiver. In North Carolina, a county waives governmental immunity when it "enters into a *valid* contract." *Smith v. State*, 222 S.E.2d 412, 423–24 (N.C. 1976) (emphasis added). But if a contract is invalid because it violates a state statute, there is no contractual waiver. *Data Gen. Corp. v. County of Durham*, 545 S.E.2d 243, 247–48 (N.C. Ct. App. 2001) (Wynn, J.). Here, the County argues that Subsection H constitutes a statute rendering its Agreement with Southern Power invalid; Southern Power maintains that the County waived governmental immunity by entering into the Agreement, a contract that assertedly (A) predates Subsection H, such that the legislation's requirements do not apply; or (B) postdates Subsection H but complies with that statute's terms.

### A.

#### i.

Because "the general rule is that the law at the time of the making of the contract governs," we need first to determine the "time of the making of the contract." *Rockwell v. Rockwell*, 335 S.E.2d 200, 202 (N.C. Ct. App. 1985). Like any other contract, the parties could not have formed this asserted contract until the moment that all of its elements — including consideration, offer, *and acceptance* — were present.

Southern Power contends that the parties formed a contract on July 24, 2007, when the parties signed the Agreement. But as the Company alleges in its Amended Complaint, the Agreement is "structured as a common unilateral contract." Am. Compl. at 4. And the defining feature of a unilateral contract is that "it is accepted by performance," rather than

4

a promise to perform. *White v. Hugh Chatham Mem. Hosp., Inc.*, 387 S.E.2d 80, 81 (N.C. Ct. App. 1990). Therefore, Southern Power could only accept the County's offer by performance. No performance, no acceptance, no contract.[2]

So when the parties signed the Agreement on July 24, 2007, they were simply agreeing about what the terms of the offer were. We know the Agreement was just an offer because it required nothing from Southern Power. The parties explicitly so stated in the Agreement: "the Company is not obligated to construct any Generating Facilities on the Site or invest any funds in the Site. Any construction or investment in the Site shall be at the Company's sole discretion." Moreover, also consistent with the Agreement's character as just an offer, the County could have "withdraw[n the offer] at any time before it [was] accepted by performance." *White*, 387 S.E.2d at 81. Thus, both Southern Power and the County could have torn up the Agreement the day after they signed it without any repercussions; in sum, the July 24, 2007, Agreement does not constitute a binding contract, only an offer.

---

[2] Perhaps recognizing the difficulties that the "structure[ of] a common unilateral contract" poses for its argument, Southern Power has since changed positions. It now argues that the Agreement contains the "trappings of both a bilateral and a unilateral contract." Southern Power Br. at 35. But the bilateral "trappings" constitute only a boilerplate recitation in the Agreement that it is supported by "consideration of the mutual covenants and commitments set forth herein, [and] other valuable and sufficient consideration." In reality, the Agreement contains no binding "mutual covenants and commitments," and is accompanied by no consideration. Rather, Southern Power correctly characterized the Agreement in its Amended Complaint: the Agreement is "structured as" and is a unilateral contract, *i.e.*, an offer from the County that can only be accepted by the Company's performance. It therefore could not have become a binding contract until the Company performed.

But if not July 24, 2007, when did the unilateral Agreement assertedly become a binding contract? (We will return to the question of whether any contract complied with applicable law.)   More specifically, when were all the elements of a contract — consideration, offer, *and acceptance* — present?  As a unilateral contract, the Agreement could only be "accepted by performance." *Id*.  Southern Power argues that it performed under the Agreement in December 2012 ("[t]he commercial operations date").[3]  Oral Argument at 49:35–50:18, *Southern Power Co. v. Cleveland County*, (4th Cir. Dec. 9, 2021)   (No.   21-1449),   https://www.ca4.uscourts.gov/OAarchive/mp3/21-1449-20211209.mp3.  If that is the case, then the Company accepted, and thus formed a contract, in December 2012.

To sum up:  The Agreement was "structured as a common unilateral contract," Am. Compl. at 4, and a unilateral contract is accepted by performance.   Southern Power

---

[3] Southern Power does not argue that it "accepted by beginning performance" prior to the passage of Subsection H.  *See Roberts v. Mays Mills*, 114 S.E. 530, 531–34 (N.C. 1922) (holding that a party accepts a unilateral contract when it commences performance). Perhaps this is because that argument would be futile; the Amended Complaint makes clear that the Company did not go beyond "preparing to perform" in the thirty-seven days prior to the passage of Subsection H.  *See* 1 Williston on Contracts § 5.13 (4th ed. 2021); *accord* Restatement (Second) of Contracts § 45, cmt. f ("What is begun or tendered must be part of the actual performance invited . . . . Beginning preparations, though they may be essential to carrying out the contract or to accepting the offer, is not enough.").  Southern Power alleges that it did not even "announce[] its plans to build" the plant until more than a year after the legislature passed Subsection H.  Am. Compl. at 10.  The principle that a party may accept under a unilateral contract by *beginning* performance differentiates this case from Southern Power's hypothetical scenario in which the legislature passed Subsection H "the day before [the Company] commenced commercial operations at Plant Cleveland."  Southern Power Br. at 32.  Here, whether Southern Power's performance began on the date that the Company went beyond mere preparation or on the commercial operations date, the result is the same:  Southern Power's performance (and therefore, acceptance) occurred after the passage of Subsection H.

accepted the County's offer in the Agreement by performance well *after* Subsection H took effect. Because acceptance is crucial to the formation of any contract, including a unilateral contract, the parties could not have formed a contract before Subsection H took effect. And thus, the relevant time for evaluating the Agreement's terms and legality is after the legislature enacted Subsection H.[4]

ii.

Southern Power resists this conclusion on three grounds.

First, the Company points to the "effective date" clause in the Agreement. The Agreement provides that "[t]he laws, ordinances, development policies, practices, procedures and standards applicable to the development of the Project are those in force at the time of the execution of this Agreement," *i.e.*, as of July 24, 2007. From this, Southern Power argues that even if all the elements of a contract were present only after the passage of Subsection H, we should apply state law as it stood when the parties signed the Agreement — weeks *before* the legislature enacted that statute. We cannot do so.

---

[4] We also note that to the extent the Agreement is ambiguous as to exactly how much Southern Power needed to do to accept and form a contract, a "court is to construe the ambiguity against the drafter — the party responsible for choosing the questionable language." *Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 528 S.E.2d 918, 921 (N.C. Ct. App. 2000). The Agreement states that it was "[p]repared by: Sanford Holshouser LLP." As Southern Power's counsel acknowledged at oral argument, this firm represented the Company, not the County. Oral Argument at 14:08–15:06, *Southern Power Co. v. Cleveland County*, (4th Cir. Dec. 9, 2021) (No. 21-1449), https://www.ca4.uscourts.gov/OAarchive/mp3/21-1449-20211209.mp3. Therefore, if the Agreement were ambiguous on this point, we would construe any ambiguity against Southern Power.

7

Ordinarily, parties may contract for a different effective date than the date of a contract's formation. *See McCallum v. Old Republic Life Ins. Co.*, 131 S.E.2d 435, 438 (N.C. 1963). But as explained in *McCallum*, a case on which Southern Power heavily relies, parties may contract for a different date "provided, of course, that . . . the terms and conditions [of the contract] *are not in violation of legal rules and requirements*." *Id*. (emphasis added).

Because Subsection H was in effect "at the time of the making of the [alleged] contract," *Rockwell*, 335 S.E.2d at 202, if that alleged contract, the Agreement, violates Subsection H, it was void as violative of state law at its inception. And if the Agreement was illegal at the time it became a contract, the parties cannot avoid that illegality by picking a different effective date.

The rationale behind this rule is clear. Allowing parties to enter illegal contracts and then backdate the contract to avoid that illegality would effectively negate the state's power to regulate private contractual relationships. We think it plain, for example, that Southern Power could not hire someone to burn outdated machinery, backdate the agreement to the day before North Carolina outlawed such behavior, and then seek to enforce the agreement. Indeed, North Carolina courts have held that parties may not waive unenforceability as against public policy "even by an express stipulation." *Martin v. Underhill*, 144 S.E.2d 872, 875 (N.C. 1965). Backdating a contract to before it became illegal would accomplish exactly that.

Southern Power's second argument in support of its view that we should evaluate the Agreement as if it were a binding contract formed prior to the enactment of

8

Subsection H rests on the "relation-back" principle. The Company cites *Erskine v. Chevrolet Motors Co.*, which held that "where one makes a promise conditioned upon the doing of an act by another, and the latter does that act . . . the contract becomes clothed with a valid consideration, *which relates back* and renders the promise obligatory." 117 S.E. 706, 710 (N.C. 1923) (emphasis added); *see also CIM Ins. Corp. v. Cascade Auto Glass, Inc.*, 660 S.E.2d 907, 910 (N.C. Ct. App. 2008) (citing *Erskine*). The Company contends that this means not only that performance renders a unilateral contract binding, but also that once performance occurs, the time of contract *formation* reverts back to the time of the offer.

But neither *Erskine* nor *CIM Ins. Corp.* involved the time of contract formation.[5] Instead, they stand for the unremarkable proposition that in the context of a unilateral contract, an offeror is bound once the offeree performs even though offer and acceptance are not simultaneous. These cases do not turn performance under a unilateral contract into

---

[5] Moreover, adopting Southern Power's interpretation of these cases would put us in tension with North Carolina precedent on the location of contract formation. For example, in *Goldman v. Parkland of Dallas, Inc.*, the key issue was whether a contract was formed in Texas (where the defendant made the offer of employment) or North Carolina (where the plaintiff accepted). 176 S.E.2d 784, 786–87 (N.C. 1970). The court agreed with the plaintiff that "[t]he final act necessary to make . . . a binding agreement was its acceptance, which was done by the plaintiff . . . in . . . North Carolina," *id.* at 787, and so the relevant law was that of North Carolina. Following *Goldman*, North Carolina courts have repeatedly held that in situations in which offer and acceptance are not simultaneous, the contract is formed where "[t]he last act necessary to make it binding occurred," which is "usually . . . the place of acceptance." *Schwarz v. St. Jude Medical Inc.*, 802 S.E.2d 783, 790 (N.C. Ct. App. 2017) (quoting *Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 348 S.E.2d 782, 785 (N.C. 1986)). It would be very strange to say that although a contract is formed *where* the offeree *accepts*, it is formed *when* the offer is *made*.

9

a time machine, transporting the time of contract formation from the moment at which all the elements of a contract are present back to the moment of the offer.

The Company's final argument that the Agreement should be evaluated as prior to the enactment of Subsection H rests on its critique of the distinction between unilateral and bilateral contracts as outmoded and disfavored. We express no opinion as to whether North Carolina should eschew the unilateral/bilateral contract distinction; what is clear is that North Carolina has not done so. *See, e.g.*, *Wray v. City of Greensboro*, 787 S.E.2d 433, 437 (N.C. Ct. App. 2016) (discussing North Carolina law of unilateral contracts). As a federal court sitting in diversity, our "function . . . is to ascertain and apply the law of [North Carolina] as it exists, . . . not [to] create or expand that State's public policy." *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 48 F.3d 778, 783 (4th Cir. 1995).

Therefore, we can only conclude that the parties had not formed a binding contract before the legislature enacted Subsection H.

## B.

Southern Power next argues that even if this is so, the Agreement complies with Subsection H's requirements. Subsection H provides:

> Each economic development agreement entered into between a private enterprise and a city or county shall clearly state their respective responsibilities under the agreement. Each agreement shall contain provisions regarding remedies for a breach of those responsibilities on the part of the private enterprise. These provisions shall include a provision requiring the recapture of sums appropriated or expended by the city or county upon the occurrence of events specified in the agreement. Events that would require the city or county to recapture funds would include the creation of fewer jobs than specified in the agreement, a lower capital investment than specified in the agreement, and failing to maintain operations at a specified level for a period of time specified in the agreement.

10

N.C.G.S. § 158-7.1(h).

Contrary to Southern Power's contentions, the Agreement violates the plain language of Subsection H in at least two ways.  First, the Agreement lacks "provisions regarding remedies for a breach of those responsibilities[6] on the part of the private enterprise." *Id.*  To the contrary, the Agreement only provides remedies to Southern Power, the private entity, if the County breaches.  Second, the Agreement fails to include a provision "requiring the recapture of sums appropriated or expended by the . . . [C]ounty" if Southern Power violates its responsibilities.  *Id.*

Southern Power responds by arguing that Subsection H is essentially precatory.  *See* Oral Argument at 19:20–24, *Southern Power Co. v. Cleveland County*, (4th Cir. Dec. 9, 2021)    (No.    21-1449),    https://www.ca4.uscourts.gov/OAarchive/mp3/21-1449-20211209.mp3 (arguing that requirements of Subsection H are "not mandatory provisions, they're guidance.").  For example, Southern Power contends that the Agreement need not provide the County with "recapture" rights because the Company must perform and pay

---

[6] Southern Power also argues that when the legislature used the word "responsibilities," it did not mean "only 'a binding contractual promise, breach of which imposes legal liability'" but instead a nonbinding condition that a party could meet or ignore at its pleasure. Southern Power Br. at 42–43. We are not persuaded. "In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute." *Dickson v. Rucho*, 737 S.E.2d 362, 370 (N.C. 2013) (quoting *Perkins v. Ark. Trucking Servs., Inc.*, 528 S.E.2d 902, 904 (N.C. 2000)). As it is used here, the Oxford English Dictionary defines "Responsibility" as "[t]he state or fact of being accountable; liability, accountability *for* something" or "[t]he state or fact . . . of having a duty towards a person or thing; obligation." *Responsibility*, Oxford English Dictionary    (online    ed.),    available    at https://www.oed.com/view/Entry/163862?redirectedFrom=responsibility#eid (last visited Dec. 22, 2021). If the legislature meant "nonbinding," we think it would have said so.

11

taxes before receiving any incentive payments.  Therefore, the Company says, recapture of funds will never be necessary and the Agreement thus complies with the statute.

We disagree.  The North Carolina legislature chose language that leaves little doubt it meant to impose mandatory requirements.  *See* N.C.G.S. § 158-7.1(h) ("Each economic development agreement . . . *shall* clearly state the[ parties'] respective responsibilities . . . *shall* contain provisions regarding remedies for a breach of those responsibilities on the part of the private enterprise . . . [and] *shall* include a provision requiring the recapture of sums appropriated or expended by the city or county upon the occurrence of events specified in the agreement." (emphasis added)).[7]  As the state's highest court has explained, "shall" typically denotes a mandatory statutory requirement.  *Silver v. Halifax Cty. Bd. of Comm'rs*, 821 S.E.2d 755, 761 (N.C. 2018).  The state legislature has said these provisions must be in every development agreement.  We may not substitute our views of how best to protect the finances of North Carolina municipalities for that of the considered judgment of the state legislature.

To make concrete the fundamental problem with Southern Power's position, take the Agreement's lack of a recapture provision.  Southern Power relies on the Agreement's requirements that it fully perform and pay its taxes before receiving any incentives, arguing that the "County cannot dispute that the terms of the Incentive Agreement are somehow

---

[7] Subsection H also uses the word "would" in other places.  *See, e.g.*, N.C.G.S. § 158-7.1(h) ("Events that *would* require the city or county to recapture funds *would* include the creation of fewer jobs than specified in the agreement" (emphasis added)).  But this does not, as Southern Power seems to argue, make compliance with the statute optional.  In context, in the statute, "would" means "if these events happen, the county would (*i.e.*, must) be able to recapture funds already expended."

unfair or less favorable than the statutory protections afforded by Subsection H." Southern Power Br. at 42. It is not clear that this is true; for example, Southern Power conspicuously fails to mention what would happen if the County discovered a breach only after it had provided incentive payments to the Company. But in any event, our role does not include evaluating how favorable the terms of the Agreement are to the County. We must instead determine whether the Agreement constitutes a valid, binding contract under state law. To say that it does, Southern Power would have us dilute Subsection H into little more than a list of best practices. We refuse to do that.

\* \* \*

Because the Agreement could not have become a contract until after the enactment of Subsection H and does not comply with that statute, the Agreement is not a valid contract. And without a valid contract, there is no contractual waiver of immunity. *See Data Gen. Corp.*, 545 S.E.2d at 247–48 ("Where a plaintiff fails to show that the requirements of [the statute at issue] have been met, there is no valid contract. . . . [The] County therefore has not waived its sovereign immunity to be sued . . . for contract damages.").

13

III.

We turn to Southern Power's alternative theory — that in entering the Agreement, the County exercised a proprietary or commercial function, not a governmental one.[8] Under North Carolina law,

> "governmental immunity covers only the acts of a municipality or a municipal corporation committed pursuant to its governmental functions." Governmental immunity does not, however, apply when the municipality engages in a proprietary function . . . [that is, a function] that is "commercial or chiefly for the private advantage of the compact community."

*Estate of Williams ex rel. Overton v. Pasquotank Cty. Parks & Recreation Dep't*, 732 S.E.2d 137, 141 (N.C. 2012) (alterations omitted) (first quoting *Evans v. Hous. Auth.*, 602 S.E.2d 668, 670 (N.C. 2004); then quoting *Britt v. City of Wilmington*, 73 S.E.2d 289, 293 (N.C. 1952)).   Southern Power argues that because the County assertedly acted in a proprietary capacity, it waived immunity from the Company's equitable estoppel claim.

We reject Southern Power's argument for two reasons.  First, the County clearly acted in a governmental, rather than proprietary, capacity because only a governmental entity could accomplish what the Agreement called upon the County to do.  Second, although equitable claims are generally available under North Carolina's proprietary

---

[8] We agree with the parties that the district court erred in relying on the public purpose doctrine, a state constitutional rule restricting the expenditure of municipal funds that does not bear on whether a particular expenditure is governmental or proprietary for immunity purposes. *See* Southern Power Br. at 50–51; County Br. at 50 n.5. Nevertheless, we may "affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court." *United States v. McHan*, 386 F.3d 620, 623 (4th Cir. 2004) (quoting *Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003)).

14

waiver doctrine, that is not the case when, as here, a party must rely on equitable estoppel because a state statute renders an asserted contract invalid.

A.

The Supreme Court of North Carolina has established a three-step test for determining if a municipality acted in a governmental or proprietary capacity. *Estate of Williams*, 732 S.E.2d at 141–43; *see also Bynum v. Wilson County*, 758 S.E.2d 643, 646 (N.C. 2014) (summarizing "three-step inquiry"). First, a court "consider[s] whether [the state] legislature has designated the particular function at issue as governmental or proprietary." *Estate of Williams*, 732 S.E.2d at 141. Here, as Southern Power concedes, the legislature has not explicitly categorized entering into this kind of development agreement as one or the other.

So the inquiry moves to the next step, which is a determination of whether or not "the undertaking is one in which *only* a governmental agency could engage." *Estate of Williams*, 732 S.E.2d at 142. If so, "it is perforce governmental in nature." *Id*. Southern Power does not address this step of the inquiry in its opening brief, but asserts in its reply that "[t]here is nothing uniquely governmental about the cash grant provided by Cleveland County, which could well have been provided by a private entity instead." Southern Power Reply Br. at 24. That may be true, but the Agreement also calls upon the County to do things that only a governmental entity can. For example, the Agreement provides that the County will "expedite the processing of all applications for permits required by the County" and "waive all fees for permitting, inspection, development or other fees normally charged by the County for development and/or industrial projects." Taken as a whole, the

15

Agreement sets forth an "undertaking . . . in which *only* a governmental agency could engage," and therefore cannot be a proprietary function. *Estate of Williams*, 732 S.E.2d at 142.[9]

Southern Power responds that we should look to the County's profit motive, arguing that the "County was not exercising governmental or police powers — it was making a prudent business decision." Southern Power Br. at 47. Undoubtedly, the County believed the potential increases in tax revenue and development outweighed the cost of the cash incentives; it said so in the Agreement. ("[T]his Project . . . allows for a significant return on investment for the County."). And we recognize the conceptual difficulty in categorizing sound fiscal management as either "promoting or protecting the . . . general welfare of its citizens" (i.e., governmental) or "engag[ing] in a public enterprise essentially for the benefit of the compact community" (i.e., proprietary), but not both. *Estate of Williams*, 732 S.E.2d at 141 (quoting *Britt*, 73 S.E.2d at 293).

But the Supreme Court of North Carolina has made clear that questions of profit motive come into play only at step three of the inquiry, that is, if "the particular service can be performed both privately and publicly." *Id.* at 143; *see also id.* (explaining that if inquiry is not resolved at second step, courts should look to, inter alia, "whether a substantial fee

---

[9] For similar reasons, we reject Southern Power's argument that the need for discovery on its proprietary waiver claim makes dismissal at this stage inappropriate. The relevant facts at this stage are, of course, those "*alleged in [Southern Power's own] complaint*." *Estate of Williams*, 732 S.E.2d at 143 (emphasis added). Moreover, as discussed above, we do not see how any amount of discovery as to the County's financial motives could overcome the fact that only a governmental entity could do what the County said it would in the Agreement. *See id.* at 143 ("[W]hen the particular service can be performed both privately and publicly . . . [courts will engage in] a fact intensive inquiry.").

is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider" (footnote omitted)).  Here, as explained above, a private entity could not take over the County's role in the Agreement.  So we need not consider either the County's financial motivations nor how best to characterize them.

## B.

The County is also entitled to dismissal on Southern Power's proprietary waiver theory because under North Carolina law, the Company cannot use equitable estoppel to enforce an illegal contract.[10]  In general, parties may use proprietary waiver to bring equitable claims, including estoppel claims, against North Carolina municipalities.  *AGI Assocs.*, 773 F.3d at 580.  However, state law also makes clear that when a statute renders a contract illegal, plaintiffs cannot use equitable estoppel to enforce that contract.  *See Finger v. Gaston County*, 631 S.E.2d 171, 174 (N.C. Ct. App. 2006) (holding that when the state legislature has "made a policy determination to forbid counties from entering into [certain contracts] . . . [t]o permit a party to use estoppel to render a county contractually bound despite [those statutory requirements] would effectively negate [that legislation].");

---

[10] In addition, we note that in North Carolina, a necessary element of an equitable estoppel claim is that the plaintiff "lack[ed] . . . knowledge and the means of [acquiring such] knowledge as to the real facts in question." *Trillium Ridge Condo. Ass'n, Inc. v. Trillium Links & Village, LLC*, 764 S.E.2d 203, 216 (N.C. Ct. App. 2014) (quoting *White v. Consol. Planning, Inc.*, 603 S.E.2d 147, 162 (N.C. Ct. App. 2004)).  Here, the relevant "facts in question" involve the County's authority to contract. *Id.*  Under North Carolina law, "parties dealing with governmental organizations are charged with notice of all limitations upon the organizations' authority, as the scope of such authority is a matter of public record." *Data Gen. Corp.*, 545 S.E.2d at 248.  Although we do not reach the merits of Southern Power's equitable estoppel argument, we note that the Company might well be unable to state such a claim for this reason.

17

*accord Transp. Servs. of N.C., Inc. v. Wake Cty. Bd. of Educ.*, 680 S.E.2d 223, 228 (N.C. Ct. App. 2009); *Data Gen. Corp.*, 545 S.E.2d at 248.  Our holding in *AGI Associates* that equitable claims are generally available under proprietary waiver entirely accords with our recognition in this case that such claims are nevertheless unavailable when they would allow a party to "obtain a result indirectly [through equitable estoppel] that the General Assembly has expressly forbidden." *Finger,* 631 S.E.2d at 174.

## IV.

We recognize, as the district court did, that the outcome here "is a harsh one."  No. 1:20-cv-00013, 2021 WL 1590056, *8 (W.D.N.C. Jan. 29, 2021).  But North Carolina courts have long held that "the General Assembly's clear intent" must be given effect, even though the resulting immunity "is likely to produce harsh results in many cases." *Lindler v. Duplin Cty. Bd. of Educ.*, 425 S.E.2d 465, 468 (N.C. Ct. App. 1993) (quoting *Plemmons ex rel. Teeter v. City of Gastonia*, 302 S.E.2d 905, 906 (N.C. Ct. App. 1983)).  For the foregoing reasons, the County is entitled to governmental immunity from suit.  The judgment of the district court is therefore

*AFFIRMED*.