**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 21-1549**

_____

SENDERRA RX PARTNERS, LLC,

　　　　Plaintiff – Appellant,

v.

BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA,

　　　　Defendant – Appellee.

_____

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Catherine C. Eagles, District Judge.  (1:18-cv-00871-CCE-JEP)

_____

Argued:  May 4, 2022                           Decided:  June 1, 2022

_____

Before KING, AGEE, and HEYTENS, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Agee wrote the opinion, in which Judge King and Judge Heytens joined.

_____

**ARGUED:**  Adam Pierson, DLA PIPER LLP (US), Dallas, Texas, for Appellant.  Adam Howard Charnes, KILPATRICK TOWNSEND & STOCKTON LLP, Winston-Salem, North Carolina, for Appellee.  **ON BRIEF:**  Marc Katz, Micala Bernardo, Breegan O'Connor, DLA PIPER LLP (US), Dallas, Texas; Paul K. Sun, Jr., Kelly Margolis Dagger, ELLIS & WINTERS LLP, Raleigh, North Carolina, for Appellant.  Chad D. Hansen, Whitney R. Pakalka, KILPATRICK TOWNSEND & STOCKTON LLP, Winston-Salem, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

Senderra RX Partners, LLC ("Senderra") appeals the district court's grant of summary judgment in favor of Blue Cross and Blue Shield of North Carolina ("Blue Cross"), arguing that the district court erred when it concluded that Senderra was not aggrieved by Blue Cross' purported violations of the North Carolina Pharmacy of Choice statute. Finding no error, we affirm.

I.

A.

Blue Cross is an insurer whose operations include a specialty pharmacy network ("the Network") in North Carolina.[1] To join the Network, prospective pharmacies must complete both a credentialing and contracting process. Blue Cross' website includes instructions on the credentialing process, which requires that the pharmacy obtain, as relevant here, a pharmacy permit issued by the North Carolina Board of Pharmacy ("NCBOP permit") as required under North Carolina law, *see* N.C. Gen. Stat. § 90-85.21(a); 21 N.C. Admin. Code 46.1401(a), and an accreditation certificate from the Utilization Review Accreditation Commission ("URAC accreditation").[2] The contracting

---

[1] Given the standard on summary judgment, we recite the facts in the light most favorable to the non-moving party, Senderra. *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 198 (4th Cir. 2005).

[2] "URAC is an independent body that accredits specialty pharmacies and other healthcare entities." J.A. 466. Blue Cross required URAC accreditation because it was "considered the gold standard for specialty pharmacies . . . . It ensures that the specialty pharmacy meets a rather rigorous set of standards for quality." J.A. 509.

3

process then "confirms that each specialty pharmacy applying to join the Network meets the applicable contract requirements and secures the pharmacy's agreement to the contractual terms that will govern its participation in the Network." J.A. 308. Those terms are included in a Network Participation Agreement ("NPA").

In 2018, Blue Cross updated the terms of the Network and, among other changes, replaced the requirement that participating pharmacies maintain a staffed business office in North Carolina with a requirement that there be a dispensing pharmacy location in North Carolina ("dispensing-location term"). Blue Cross then solicited from its existing Network members applications to join this new specialty pharmacy network. Its solicitation specified that "pharmacies that d[id] not meet the requirements for participation in the new specialty pharmacy network w[ould] receive [a] notice of removal" from it. J.A. 672. Interested pharmacies had to "submit all necessary paperwork that [Blue Cross] require[d] by [October 1] for a [January 1] entry date." J.A. 713.

Along with this solicitation, the participating pharmacies received the updated NPA and NPA Addendum ("Addendum"). Those materials identified the new dispensing-location term, as well as the licensing, certification, and accreditation requirements. Specifically, the Addendum indicated that the pharmacies "must have a dispensing location within the state of North Carolina." J.A. 713. The Addendum also detailed that each pharmacy must "maintain [URAC] Specialty Pharmacy accreditation and provide proof thereof." J.A. 709. In addition, the NPA established that the participating pharmacies must hold the necessary licensing and certification "under North Carolina and any other applicable law." J.A. 687. Finally, the NPA referenced "Policies and Procedures" that were

4

listed on Blue Cross' website, J.A. 689, which explained that each specialty pharmacy location was required to hold an NCBOP permit and URAC accreditation, as well as the Provider Manual, which detailed the credentialing process.

In actual application, Blue Cross permitted pharmacies to satisfy the dispensing-location term through a corporate affiliate,[3] but did not expressly offer pharmacies this option. Instead, "[w]hen a pharmacy communicated their intent to satisfy [the dispensing-location term] through corporate affiliation[,] [Blue Cross] discussed with them . . . how to go about doing that." J.A. 1139.

## B.

Senderra is a Texas-based specialty pharmacy that first applied to join the Network in 2013. After initially submitting an insufficient application for lack of proof of an NCBOP permit or URAC accreditation, it was admitted into the Network in 2015.

Senderra received Blue Cross' updated Network materials on May 3, 2018, acknowledging on May 7, 2018, that it likely "ha[d] to go through a whole new application process to be in [Blue Cross'] new Statewide Specialty Pharmacy Network." J.A. 374. Senderra's "biggest concern [was] the dispensing location within [North Carolina]." J.A. 373. Because it only had "a staffed business office" in North Carolina, *id.*, it recognized that the dispensing-location term "w[ould] preclude [it] from being able to qualify under the new terms and conditions and w[ould] result in its termination from the specialty

---

[3] Corporate affiliate agreements involve "the parent or umbrella organization . . . contract[ing] with a payer on behalf of all of those locations or entities within its structure." J.A. 871.

5

network," J.A. 755. Nonetheless, Senderra "decided to apply into the network first and get an anticipated rejection letter." J.A. 761.

Senderra submitted its application on June 1, 2018. After Blue Cross confirmed that Senderra only had a staffed business office in North Carolina, it sent Senderra a termination letter dated July 11, 2018, stating that Senderra's NPA would terminate effective October 15, 2018, for failure to "satisfy the requirements for continued participation in [the Network]." J.A. 173.

Upon receipt of this letter, Senderra contacted Blue Cross "to inquire about . . . the reason for termination," J.A. 638, although it "assum[ed]" it had been terminated due to its lack of a dispensing location in North Carolina, J.A. 639. As Blue Cross confirmed on July 26, 2018, Senderra was noticed for termination because it "did not have a dispensing location within North Carolina." J.A. 30.

Senderra subsequently obtained a physical dispensing location in North Carolina and submitted a new application on September 14, 2018, stating that it had "a dispensing pharmacy location address in [North Carolina] to fully satisfy the requirements for participation in the new specialty network." J.A. 183. However, the location did not possess an NCBOP permit as required by North Carolina law. In response, on September 18, 2018, Blue Cross informed Senderra that "[o]nce th[e] new pharmacy location [was] credentialed, provided all other requirements [were] satisfied, the new site [would] be included as a dispensing location on the new contract." J.A. 195. But Senderra did not timely obtain an NCBOP permit for that location, so its NPA was terminated effective October 15, 2018, as originally scheduled.

6

While Blue Cross terminated Senderra from the Network for failure to comply with the dispensing-location term, Blue Cross learned during the underlying litigation that it "inadvertently" allowed two pharmacies—Avita Pharmacy ("Avita") and Long's Drugs ("Long's"), both of which had existing permitted dispensing locations in North Carolina— to execute new NPAs despite their dispensing locations lack of URAC accreditation. J.A. 470. As a result, Blue Cross "noticed both pharmacies for contract termination." J.A. 255. But when the pharmacies notified Blue Cross that "they intended to exercise their right to cure" under the terms of the new NPA and requested an extension to do so, Blue Cross granted the requests.[4] J.A. 529–30. In contrast, Blue Cross denied Senderra such an extension because Senderra was fundamentally ineligible to execute the new NPA due to its lack of a permitted dispensing location, meaning it could not invoke the right-to-cure provision. *See* J.A. 534 (Blue Cross' Rule 30(b)(6) witness explaining that Avita and Long's "had a North Carolina pharmacy. It was not a credentialed one. But it was a location, a dispensing location[, so] they were allowed to contract. . . . [Whereas Senderra] didn't even have any [dispensing] location in North Carolina that—you know credentialed or uncredentialed"); J.A. 1210 (relaying that Blue Cross "allowed Long's Drugs and Avita additional time to cure their breaches of the NPAs because . . . [they] were not at fault for [Blue Cross] inadvertently failing to ensure they were fully credentialed before offering

---

[4] In a similar vein, Senderra permitted AllianceRX, which also had a permitted dispensing location in North Carolina, to execute the new NPA past the October 2018 deadline in December 2018.

them an NPA and [Blue Cross] felt it would be unfair and inequitable to punish [them] for [Blue Cross'] inadvertence").

Senderra ultimately obtained an NCBOP permit for its North Carolina dispensing location on November 5, 2018, and URAC accreditation on March 12, 2019 (both well after the October 15, 2018, deadline). It then reapplied for admission into the Network and executed a new NPA on March 30, 2019, with an effective date of July 1, 2019. As a result of Senderra's exclusion from the Network, its expert estimated a loss of $13,999,315.33 in revenue and $232,476.57 in profits.  Senderra's expert also projected that Senderra would incur further damages for up to five years after its readmittance.

C.

On October 15, 2018, Senderra filed suit against Blue Cross, asserting violations of the North Carolina Pharmacy of Choice statute ("NCPOC statute"), N.C. Gen. Stat. § 58-51-37, and Article 1 of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C. Gen. Stat. § 75-1.1, and for breach of the NPA. After Blue Cross informed Senderra that it inadvertently admitted Avita and Long's into the Network, Senderra amended its complaint to include, as relevant here, a claim of fraud.[5]

Blue Cross subsequently moved to dismiss Senderra's amended complaint, which the district court granted in part and denied in part. At the close of discovery, Blue Cross moved for summary judgment on the remaining claims, and the district court granted the motion. As for Senderra's claim under the NCPOC statute, while the court recognized that

---

[5] While Senderra's amended complaint included its original claims under the NCPOC statute and the NCUDTPA, it did not raise a claim for breach of the NPA.

8

"[n]o court ha[d] clearly set forth the elements of 'a violation of this section' or defined when a pharmacy is 'aggrieved by such a violation,'" the court reasoned that it was elementary that Senderra show it was aggrieved by Blue Cross' actions. J.A. 1575. The court concluded that Senderra could not do so because

> all the evidence show[ed] that [Blue Cross] made its terms available to Senderra through mailings and its website, that Senderra knew [Blue Cross] required an in-state dispensary, and that Senderra did not have an operational in-state dispensing pharmacy when it applied to participate in the new network in June or when the old contract expired. Thus, Senderra did not meet a clearly communicated term required by [Blue Cross.]

J.A. 1576–77.

The court recognized that even though Senderra asserted it was unaware of Blue Cross' credentialing requirement until October 2018, "Senderra was not aggrieved by that purported violation because Senderra had not met the preliminary requirement of having a permitted in-state dispensing pharmacy." J.A. 1577. And although Senderra challenged Blue Cross' failure to inform it of the option to satisfy the dispensing-location term by corporate affiliate, the court explained that the NCPOC statute "requires [Blue Cross] to make its terms available to interested pharmacies, not walk the pharmacy through how to meet those terms." *Id.* Finally, the court found unavailing Senderra's argument that Blue Cross improperly admitted Avita and Long's despite the fact that their dispensing locations lacked URAC accreditation, reasoning that

> [t]his d[id] not matter, as Senderra did not have a permitted in-state dispensary. Assuming [Blue Cross] violated the statute by inadvertently offering different terms to different pharmacies, Senderra was not aggrieved by that violation since it did not meet the basic term imposed on all pharmacies and met by every pharmacy admitted into the network.

9

J.A. 1578.

As for the fraud claim, the court found that Senderra could neither demonstrate reasonable reliance on the purported misrepresentations nor cognizable harm from them. Finally, the court determined that the NCUDTPA claim failed for the same reasons the other claims failed.

Senderra timely noted an appeal, over which we have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

"We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

As a preliminary matter, Blue Cross asserts that Senderra lacks Article III standing because it cannot demonstrate that any injury it sustained was "fairly traceable to the

10

challenged action of the defendant."[6] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In other words, Blue Cross avers that Senderra effectively caused its own injury, as its failure to comply with the fundamental requirements of the dispensing-location term—namely, to establish a permitted dispensing location in North Carolina—led to its termination from the Network.

But Senderra alleges its injury was due to myriad circumstances fairly traceable to Blue Cross, including, among other allegations, that Blue Cross "fail[ed] to provide sufficient information as to the various requirements for a dispensing location," issued "vague, incomplete and conflicting" instructions on how to satisfy them, and enforced them with "unequal force and manner." J.A. 1569–70 (citation omitted). *Compare with GBA Assocs. v. Gen. Servs. Admin.*, 32 F.3d 898, 901 (4th Cir. 1994) (reasoning that the plaintiff lacked standing solely due to its own shortcomings, which "br[oke] the chain of causation and divest[ed] [it] of standing"). Senderra's injury is therefore at least fairly traceable to Blue Cross' actions. *See Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (explaining that the causation element "does not require the challenged action to be the sole or even immediate cause of the injury"). Accordingly, we are satisfied that Senderra meets the causation element of Article III standing to proceed with its claims against Blue Cross.

---

[6] Although Article III standing was not raised below, we consider it here because we "have an independent obligation to ensure that [we] do not exceed the scope of [our] jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

IV.

On appeal, Senderra contends that the district court erred when concluding that it was not aggrieved by Blue Cross' alleged violations of the NCPOC statute. While the parties spar over the legal framework under which this argument should be housed, invoking concepts such as statutory standing and proximate cause in the process, we find Senderra's core argument unpersuasive in any event. We therefore perceive no error in the district court's determination that Senderra was not aggrieved by Blue Cross' actions.

Senderra alleges that Blue Cross violated three provisions of the NCPOC statute's subsection (c), which direct that "the terms of a health benefit plan shall not":

> (1) Prohibit or limit a resident of this State . . . from selecting a pharmacy of his or her choice when the pharmacy has agreed to participate in the health benefit plan according to the terms offered by the insurer;

> (2) Deny a pharmacy the opportunity to participate as a contract provider under a health benefit plan if the pharmacy agrees to provide pharmacy services that meet the terms and requirements . . . of the insurer under a health benefit plan . . . ; [or]

> (4) Impose a monetary advantage or penalty under a health benefit plan that would affect a beneficiary's choice of pharmacy[.]

N.C. Gen. Stat. § 58-51-37(c)(1), (2), (4). Relevant here, "[a] violation of this section creates a civil cause of action for damages or injunctive relief in favor of any person or pharmacy aggrieved by the violation." *Id.* § 58-51-37(h).

While the parties contest the applicability of subsection (c) of the NCPOC statute to Senderra's claims (with Blue Cross asserting that subsection (e) of that statute controls), we need not resolve the issue. Assuming, without deciding, that Senderra's claims can be

12

housed under subsection (c), Senderra has failed to establish it was aggrieved by Blue Cross' actions. We thus address the relevant provisions of subsection (c) in turn.

A.

Senderra first argues that Blue Cross violated subsections (c)(1) and (2) of the NCPOC statute, which can protect pharmacies that have agreed to, and comply with, the terms required by the insurer. Senderra fails to qualify as such a pharmacy for the reasons cited by the district court—namely, that Senderra did not satisfy the NPA's threshold requirement to establish a permitted dispensing location in North Carolina before the October 2018 termination deadline.

To start, the record reflects that the materials Senderra received from Blue Cross on May 3, 2018, enumerated that a physical dispensing location in North Carolina was required to participate in the new Network. Senderra was expressly aware of this new term––in fact, it was Senderra's "biggest concern" when it came to the new Network. J.A. 373.

Moreover, Senderra was (or should have been) aware of the permitting aspect of the dispensing-location term as it was required by North Carolina law. *See* N.C. Gen. Stat. § 90-85.21(a); 21 N.C. Admin. Code 46.1401(a). Its argument to the contrary borders on nonsensical. As a sophisticated entity, Senderra cannot claim ignorance of such a standard state-imposed requirement, particularly when it had previously submitted an application for admission into the Network in 2013 that was deemed insufficient for lack of an NCBOP permit. As the district court remarked on this point, "Why would anybody who runs a pharmacy think that [it] would suffice to have a pharmacy that couldn't actually dispense drugs for prescriptions?" J.A. 1543. Not to mention, the materials Senderra received from

13

Blue Cross in May 2018 contained general information on holding the necessary licensing and certification "under North Carolina and any other applicable law," J.A. 687, and referenced "Policies and Procedures" that were listed on Blue Cross' website, J.A. 689, which explained that each specialty pharmacy location was required to hold an NCBOP permit.

Despite the clarity of these requirements, at no time prior to the October 2018 deadline did Senderra establish a permitted dispensing location in North Carolina, a fact which it conceded during oral argument. Oral Argument at 9:54–10:05, *Senderra RX Partners, LLC v. Blue Cross & Blue Shield of N.C.* (No. 21-1549) (4th Cir. May 4, 2022), https://www.ca4.uscourts.gov/OAarchive/mp3/21-1549-20220504.mp3 (Senderra conceding that it "did not have the in-state dispensing location requirement met by October 15 as it was ultimately required by Blue Cross"). And on this basis, Blue Cross terminated Senderra from the Network. Because Senderra failed to comply with required components of the dispensing-location term, it cannot claim protection under subsections (c)(1) and (2) of the NCPOC statute as an aggrieved party as if it had complied with those provisions.

Senderra raises three primary arguments in response, none of which is persuasive. First, it claims that the new NPA and Addendum did not clearly convey that the North Carolina dispensing location needed to be credentialed. But this point is immaterial to Senderra's case because, as discussed above, it was unable to establish a permitted dispensing location. That is to say, whether Senderra could have hypothetically met the credentialing requirement is irrelevant, as it had yet to establish a permitted dispensing location in North Carolina by the October deadline.

14

Next, Senderra asserts that Blue Cross' treatment of Avita, Long's, and AllianceRX evinces Blue Cross' disparate conduct towards Senderra because Avita and Long's executed the new NPA despite their permitted dispensing locations in North Carolina lack of URAC credentialing and were granted an extension to cure that defect, and AllianceRX signed its new NPA after the October deadline in December 2018. But the circumstances of these pharmacies are not analogous to those of Senderra. Avita, Long's, and AllianceRX all had timely permitted dispensing locations in North Carolina, a fact which Senderra acknowledged during oral argument. *Id.* at 10:30–10:43 (Senderra conceding that these three pharmacies "had an actual physical location" in North Carolina "that could dispense drugs," and that Senderra did not). In other words, no pharmacy was admitted to the Network without a permitted dispensing location, which Senderra undeniably lacked. So, while Senderra makes much of Blue Cross' treatment of Avita, Long's, and AllianceRX, their respective positions were fundamentally distinguishable from that of Senderra.

Lastly, Senderra argues that Blue Cross should have made it aware that relying on a corporate affiliate was an acceptable alternative mode of fulfilling the dispensing-location term. But the record establishes that Blue Cross did not offer this option to any pharmacy. J.A. 1139 (explaining that Blue Cross "did not proactively raise . . . ways to satisfy the requirement with any pharmacy"). Rather, "[w]hen a pharmacy communicated their intent to satisfy [the dispensing-location term] through corporate affiliation[,] [Blue Cross] discussed with them . . . how to go about doing that." *Id.* Quite simply, Senderra did not ask Blue Cross about this option, so Blue Cross did not explain how to utilize it. Senderra

15

was therefore on equal footing with the other specialty pharmacies, as it should have inquired about this option if it intended to rely on it.

To obtain the protection of subsection (c)(1) or (2), Senderra had to comply with "the terms offered by the insurer" and "meet the terms and requirements . . . of the insurer." N.C. Gen. Stat. § 58-51-37(c)(1)–(2). Having failed to demonstrate that it complied with the insurer's fundamental condition precedent of the dispensing-location term, Senderra cannot make a claim under subsections (c)(1) and (2) of the NCPOC statute.

### B.

Next, Senderra claims that Blue Cross violated subsection (c)(4) of the NCPOC statute, which directs that the terms of a health benefit plan shall not "[i]mpose a monetary advantage or penalty . . . that would affect a beneficiary's choice of pharmacy." *Id.* § 58-51-37(c)(4). Specifically, Senderra argues that Blue Cross effectively granted certain pharmacies a monetary advantage when it permitted them to remain in the new Network despite their lack of credentialing (Avita and Long's) or a timely executed NPA (AllianceRX). For the reasons explained by the district court, Senderra's claim on this point fails as well.

At bottom, Senderra does not fall within the class of claimants this provision protects. The examples of "monetary advantage or penalty" cited in subsection (c)(4) make clear that it protects pharmacies within the Network. Said another way, "higher copayment, a reduction for reimbursement for services, or promotion of one pharmacy over another" are all advantages or penalties that only participating pharmacies would face. *Id.* But unlike Avita, Long's, and AllianceRX, Senderra was not a participating pharmacy in the new

16

Network due to its termination for failure to establish a permitted dispensing location. Therefore, it fails to qualify within the class protected by this subsection, meaning it cannot claim it was aggrieved by Blue Cross' conduct.

V.

Finally, Senderra contests the district court's grant of summary judgment in favor of Blue Cross on its fraud and alleged NCUDTPA violation. Assuming *arguendo* that Blue Cross engaged in misrepresenting or concealing the credentialing component of the dispensing-location term, Senderra cannot demonstrate that this conduct caused its injury. *Ragsdale v. Kennedy*, 209 S.E.2d 494, 500 (N.C. 1974) (enumerating the elements to establish a claim for fraud).[7] As discussed above, Blue Cross terminated Senderra from the Network for failure to establish a permitted dispensing location in North Carolina, meaning Senderra's exclusion was unrelated to Blue Cross' representation of the credentialing component. Accordingly, the district court properly granted summary judgment in favor of Blue Cross on Senderra's fraud claim. And because Senderra recognizes that its alleged NCUDTPA violation rises and falls with its other claims, we likewise conclude that summary judgment was proper as to that claim.

VI.

For the reasons discussed above, the judgment of the district court is

---

[7] Because we sit in diversity in this case, North Carolina law applies. *S. Power Co. v. Cleveland Cnty.*, 24 F.4th 258, 262 (4th Cir. 2022).

17

*AFFIRMED.*